[Crim. No. 1179.    Department Two.—March 1, 1905.]

## THE PEOPLE, Respondent, v. GRIFFITH J. GRIFFITH, Appellant.

CRIMINAL LAW—ASSAULT WITH INTENT TO MURDER—INSTRUCTIONS—ALCOHOLIC INSANITY—DRUNKENNESS.—Upon a charge of assault with a pistol with intent to murder the defendant's wife, where the defense was chronic alcoholic illusional insanity, as the result of long-continued heavy drinking, and there was evidence to show that defendant had drunk liquor on the day of the shooting, it was proper to instruct the jury that voluntary intoxication is no excuse for crime, but may be considered in determining the degree of crime, and that in determining the question of responsibility they should keep in mind the distinction between ordinary drunkenness and alcoholic insanity.

ID.—INSTRUCTION AS TO ASSAULT WITH DEADLY WEAPON—CONSTRUCTION FROM CONTEXT.—An instruction that if the jury were satisfied beyond a reasonable doubt that the defendant committed the assault charged, without an intent to kill or murder, they should find the defendant guilty of an assault with a deadly weapon, must be construed in its context with other repeated instructions upon the doctrine of reasonable doubt; and as to the right of acquittal upon proof of insanity by a preponderance of evidence, and so construed, is not to be considered a command that they should find him guilty of an assault with a deadly weapon.

ID.—REFUSAL OF REQUEST—PRESUMPTION OF GOOD CHARACTER.—Where no evidence upon the subject of the character of the defendant was introduced, and no instruction was given thereupon, and the only issue was upon the question of insanity, it was not error to refuse to give a requested instruction that the defendant was by law presumed to be a man of good character, in the absence of any evidence to the contrary.

ID.—INSTRUCTION AS TO PENALTY OF LESS OFFENSE—HARMLESS IRREGULARITY.—Though it is an irregularity upon request of the jury to instruct them as to the penalty for the less offense of an assault with a deadly weapon, yet, where such instruction was correctly given, it is harmless and not ground for reversal of a judgment of conviction of the less offense.

ID.—INSTRUCTION AS TO PARTIAL INSANITY.—It was proper to instruct the jury that where partial insanity, or insane delusion, or hallucination is relied upon, it must be made to appear that the crime charged was the product or offspring thereof, and not the result of some sane reasoning and natural motives.

ID.—EXPERT EVIDENCE—SYMPTOMS OF ALCOHOLIC INSANITY—REBUTTAL—SURREBUTTAL.—Where expert evidence for the defendant had gone fully into the subject of the necessary symptoms of alcoholic insanity, and this testimony was contradicted in rebuttal by expert witnesses for the prosecution, it was not improper for the court to refuse to allow other expert evidence for the defendant in surrebuttal.

ID.—PRIVILEGED COMMUNICATIONS—PHYSICIAN AND PATIENT.—The rule as to privileged communications between a party and his physician has no application in a criminal case.

ID.—HYPOTHETICAL QUESTION AS TO INSANITY—FACTS IN EVIDENCE.—A hypothetical question to a physician based upon assumed facts in evidence in connection with the shooting, and asking him for his opinion upon such hypothesis, as to whether such a subject asking such questions and acting in such a manner was under certain insane delusions, is not subject to the objection that it called for an opinion as to the defendant's sanity.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. B. N. Smith, Judge.

The facts are stated in the opinion of the court.

Earl Rogers, J. W. McKinley, John T. Jones, and Luther G. Brown, for Appellant.

U. S. Webb, Attorney-General, Henry T. Gage, I. B. Dockweiler, and W. I. Foley, for Respondent.

HENSHAW, J.—Defendant was charged with the crime of assault with intent to commit murder. The jury returned a verdict finding him guilty of the lesser crime of assault with a deadly weapon. From the judgment which followed upon the entry of this verdict, and from the order denying his motion for a new trial, he appeals.

The assault was committed upon the person of defendant's wife, and her narrative of the occurrence is as follows: The Griffiths had been living at the Arcadia Hotel in Santa Monica and were about to remove to Los Angeles. Upon September 3d the defendant went from Los Angeles to Santa Monica and proposed to his wife a walk upon the beach. They took this walk, purchasing some souvenir postal-cards at a curio-store, thence to the plunge-bath, and thence back to the hotel, where the wife resumed the packing of her trunks, as they were to leave the hotel the following day. She had nearly packed her trunk when her husband entered. He took his overcoat from the closet and placed it in the trunk which she was packing, went into another of their apartments, and when next he entered the room brought with him his wife's prayer-book. His wife noticing it, said: "Never mind about the things in the top bureau. I will pack them later." Her husband handed her the prayer-book and told her to get down on her knees and swear to certain things he was about to ask her. She was very much alarmed, and she took the book, got down on her knees, and then noticing a revolver in his hand she pleaded with him to put the revolver away. He said, "Close your eyes and do as I command you." When his wife saw he was determined, she asked him to let her pray, and raised her eyes and prayed. After she had ceased her prayer he asked her three questions. He took a slip of paper out of his pocket and read the questions from the slip, and asked her the first question, if she knew who had been responsible for the death of or who had poisoned Mr. Briswalter. She answered no, that Mr. Briswalter had not been poisoned, but had died from blood-poisoning. She undertook to narrate the circumstances of his sickness, when her husband immediately stopped her, and said, "That is enough." He then asked, "Have you ever been implicated in trying to poison me?" and she replied: "Why, papa, I have never harmed as much as a hair of your head." "The third question was, if I had ever been

untrue to him. I said, 'You know I have not,' and with that I was shot. I immediately jumped up on my feet and I said, 'Why did you shoot me?' and I backed towards the window with one hand up against my face, and with the other I raised the window and out I went on my back. As soon as I struck the roof below I picked myself up as well as I could and reached the room directly under this, got up and raised the window and went over to the stand and got a towel and stayed the wound—the flow of blood. In the mean time Mr. Wright of the Hotel Arcadia opened the door and at Mr. Wright's back stood, I could see the face of Mr. Griffith, and I says, 'For God's sake don't let him in, he has just shot me. He must have been crazy,' I said in an offhand way." The bullet struck the unfortunate woman upon the eyebrow, the lead was split, part of the missile destroying the sight of her eye.

The defense was alcoholic insanity. The defendant was not a witness in his own behalf, but evidence was offered to show, and the line of defense was that he had always been a man of oddities and eccentricities; that for years he had been a heavy drinker, and usually a secret and solitary drinker. This excessive use of liquor so persisted in, acting upon his mind, a trifle eccentric at all times, produced a condition which the physicians for the defense described as chronic alcoholic illusional insanity; that he was a man of overweening and inordinate vanity; that he entertained the delusion that his wife had been attempting his death by poison; that he entertained the delusion that his wife had been false to her marital vows; that he entertained the delusion, in connection with the poisoning, that his wife, who was of the Catholic faith, was the chosen instrument of the church for his destruction.

As to the circumstances attending the shooting of Mrs. Griffith there is little or no substantial controversy, saving upon one matter, the nature of the shooting itself. Here the contention of the defense is, that the defendant, even in his insanity, did not designedly cause the discharge of the pistol; that his wife was making oath, as her husband was demanding, so that there was no occasion to shoot her, that the pistol was a hair-trigger weapon, and that it was discharged accidentally, either because of the extreme nervousness of the insane man, or because his wife in her terror and

fear grasped it, and attempted to wrest it from his hands. Upon the part of the prosecution it was, however, contended, and evidence was offered to show (as tending both to prove sanity and motive) that while defendant was, admittedly, an extremely vain and self-sufficient man, he was fully competent to transact, and did transact, business of magnitude and consequence; that he drank heavily, and while in his drunken fits was suspicious, jealous, and abusive of his wife; that differences had existed between them of long standing over religious questions, and over the wife's property rights, concerning which she had tried, and tried in vain, to compel from him a settlement; that she had threatened to leave him if he continued to drink, and that in his wrath over all these matters, inflamed by liquor, he had brutally done the deed.

The Griffiths were people of wealth and consequence in the community; special counsel, eminent in the law, were, as is usual in such cases, employed upon either side. The trial was a protracted one. Much expert evidence from physicians was produced upon either side, and many exceptions were reserved by the defense, all of which are here pressed upon us for consideration. We can notice only those which present matters of serious consideration. Some of the others, even if technically errors, could not, from the nature of the case, have injured in the slightest respect the defendant's rights.

Nor do we consider it necessary to present the facts of the case with any more elaboration and detail than as above given. It is perhaps, however, proper to add that it was not pretended by the defense that there was any foundation in the slightest degree for the charges and insinuations which the defendant brought against his wife; but, to the contrary, it was admitted that she stood wholly blameless in all those matters.

The instructions given and refused by the court upon the subject of insanity are first attacked, and at the outset it is said that the court erred in instructing the jury to the effect that voluntary intoxication is no excuse for crime, but may be considered when an actual existence of a particular motive is necessary to constitute a crime and in determining the degree of crime, and in further instructing the jury that in weighing the evidence offered to show the excessive use of alcohol by the defendant, as bearing upon the question of his responsibility, they should keep in mind the distinction be-

tween a state of ordinary drunkenness and alcoholic insanity. It is urged that these instructions were prejudicial to the defendant, in that there was no evidence to show that at the time of the shooting the defendant was drunk or voluntarily intoxicated, or in a condition of involuntary intoxication.. But there was positive evidence that the defendant had drunk liquor upon the very day of the shooting. It was in evidence, from the testimony of at least one of his physicians, that from the defendant's statements he judged that he drank about a pint of whisky a day for a great many years, and sometimes greatly exceeded this. The hypothetical questions addressed to the physicians assumed "that a man has used from a pint to a pint and a half of whisky a day, intermixed with quantities of champagne," and the testimony of the wife, when asked upon the cross-examination whether her husband in times past had not propounded similar questions to her about her infidelity and about his being poisoned, answered that he had done so "when he was drunk." Counsel for the defense then asked this question: "And after he had been drinking and hardly recovered sometimes?—A. Well, it was principally from the effects of drink he propounded these questions." Such being the condition of the evidence, it not only cannot be said that it was error for the court to instruct upon the subject of voluntary intoxication, but, to the contrary, it was the duty of the court so to have instructed, in order that the jury might be enlightened as to the difference between such voluntary intoxication and insanity, the result of long-continued and excessive alcoholic indulgence. And, finally, upon this point it may be added that the court not only cautioned the jury to distinguish between voluntary intoxication and insanity, which may be the result of it, but charged the jury, at the request of the defendant, in this language: "While voluntary intoxication or drunkenness is no excuse for a criminal act committed under its influence, yet you are to consider insanity caused by it, in the same way as insanity produced by any other cause."

Appellant detaches from its context an instruction which the court gave, to the effect that if the jury entertained a conviction beyond a reasonable doubt that the defendant committed an assault upon the person of his wife, as charged in the information, but not with an intent to kill her or murder

her, they should find the defendant guilty of assault with a deadly weapon. It is charged against this instruction that as, admittedly, such an assault had been made, it commanded the jury to find him guilty. But the vice of this is, as has been frequently pointed out by this court, in detaching the instruction and asking that it be read as though it were the only instruction given by the court upon the whole subject-matter. The jury were repeatedly and re-repeatedly instructed upon the doctrine of reasonable doubt and upon insanity proved by a preponderance of evidence entitling a defendant to an acquittal on any criminal charge.

The court refused to give an instruction at the request of the defendant to the effect that the defendant was by law presumed to be a man of good character, in the absence of any evidence to the contrary, and to show error reliance is had upon *People* v. *Gleason,* 122 Cal. 370. In that case, however, an instruction was actually given by the judge to the effect that the people are not permitted to assail the character of a defendant until the defendant has himself put his character in issue by calling witnesses and offering evidence in its support, and unless put in issue by the defendant the people can in no way attack his character. This court's language in *People* v. *Gleason,* 122 Cal. 370, was directed to that state of facts, and it was held that it constituted an unwarranted reflection upon the defendant in suggesting to the jury that if the prosecution had had an opportunity to do so it might possibly have shown that he was not a man of good character. In the present case no evidence as to character was introduced, and no instruction as to character was given, and, as is said further in *People* v. *Gleason*: "Instructions upon abstract rules of law which have no application to the evidence in the case, tend to confuse rather than to enlighten the jury, and ought not to be given." While in *People* v. *Doggett,* 62 Cal. 27, it is said that a defendant's good reputation as to traits involved in the charge, *if proved,* should be weighed as any other fact established. The error of the court in the Gleason case arose from the giving of an instruction not addressed to the evidence and extremely prejudicial to the defendant. It may not be said that in this case, in the absence of any evidence, the court's refusal to give the desired instruction was error, to the prejudice of defendant, for the

reason that the acts charged against the defendant were admitted, and are in the brief of the appellant expressly admitted. It is further admitted that those acts, if committed by a sane man, constituted the crime of which the defendant was convicted. The single issue, therefore, before the jury over which contest was raised was whether or not the defendant was sane at the time of their commission.

After having retired to deliberate upon their verdict, the jury asked to be returned to court to receive further instructions, and when in court asked, ''What is the penalty for an assault with a deadly weapon?'' In answer to this query the court correctly instructed them as to the penalty. It has been held that an incorrect instruction upon this subject is not only erroneous in itself, but is to be regarded as prejudicial to a defendant. (Blashfield on Instructions to Juries, par. 189.) But upon the other hand, where the instruction upon this point is correct in point of law, this court has declared that while it is an impropriety and irregularity, it is not such an irregularity and impropriety as should work a reversal of the case. ''Nor is it one of which the defendant may justly complain, since the influence upon the jury is most favorable to him.'' (*People* v. *Dice,* 120 Cal. 202; *People* v. *Jackson,* 57 Cal. 316.)

The instruction to the effect that when partial insanity or insane delusion or hallucination is relied upon, it must be made to appear that the crime charged was the product or offspring of such insanity, insane delusions, or hallucinations, and not the result of some sane reasoning and natural motives, was an instruction approved by this court in Bank in *People* v. *Hubert,* 119 Cal. 216,[1] and upon reconsideration we are still of the opinion that it is not only sound in point of law, but, as addressed to the evidence in the case at bar, was pertinent and admissible.

The foregoing disposes of appellant's objections raised upon the instructions.

Upon the rulings of the court in admitting and rejecting evidence it is urged that the court erred in refusing the defense an opportunity to present evidence in rebuttal upon the proposition of chronic alcoholic insanity. The defendant, it seems, had submitted himself for examination to certain

[1] 63 Am. St. Rep. 72, and note.

medical men shortly after the shooting, and had declared to them his symptoms, hallucinations, or beliefs. Upon this they testified as experts that he was suffering from chronic alcoholic insanity, or, as one of the physicians phrased it, "He may not be legally insane, but he certainly is not sane." These physicians were carried through a long course of cross-examination upon the symptoms and hallucinations found in chronic alcoholic insanity, and testified fully upon these matters. The prosecution, to meet this evidence, called their physicians and medical men as experts, who gave their views as to the symptoms and hallucinations which were present in and necessarily accompanied chronic alcoholic insanity. They were asked and answered hypothetical questions addressed to the evidence in the case, and declared that in their view the defendant was not suffering from chronic alcoholic insanity. A great deal of this evidence was offered and received upon either side. Finally, when the prosecution rested its rebuttal, defendant attempted to recall his medical experts to disprove by them certain statements made by the experts for the prosecution, and in particular this statement: Certain of the medical experts for the prosecution had testified in expressing their belief that the defendant was not the victim of chronic alcoholic insanity, that the existence of a delusion touching the sexual organs was always found in such cases. The question sought to be asked by the defense of their experts in surrebutter was the following: "Referring to the symptoms of chronic alcoholic insanity state whether in your opinion a delusion with reference to the sexual organs of the patient is an essential element in the determination of the existence of chronic insanity in the patient." The question was objected to, and the objection sustained upon the ground that it called for an opinion in reference to a matter which was not surrebutter. We think the ruling was correct. The defense in making out its case of insanity had called its experts; they had been interrogated as to the symptoms which they themselves said were necessarily present in a patient so afflicted. In rebuttal the prosecution asked their experts for their opinions under the evidence in the case, and in view of these experts the defendant was not suffering from this form of insanity. Some of these experts, as reason for their belief, stated that this particular delusion was an essential delusion

in chronic alcoholic insanity. If it be conceded that it was technically surrebutter to allow the defense in turn to show by the opinion of their recalled experts, that such a delusion was not essential, nevertheless it was but touching directly upon a matter which these same witnesses had discussed indirectly in their first examinations. If the practice could be continued without being checked in the discretion of the court, it could go on to infinity. So that, even if it be regarded as technically evidence in surrebutter, the whole ground of the examination had previously been completely covered. What has here been said refers to the whole line of questions upon the same general subject-matter which were asked by the defense in surrebutter, and to which questions the court sustained the objections of the prosecution. To illustrate that the matter had been gone into upon the defendant's case in chief, it will be sufficient to quote the question put to Dr. Nichols, appellant's witness, by one of his counsel: ''Q. Do you further agree with Spitzka on this proposition; the persecutory delusions of alcoholism relate to the sexual organs, to the sexual relations, and to poisoning? This fact is so constant a one that the combination of a delusion of the sexual organs with the delusion that the patient's food is poisoned and that his wife is unfaithful to him, may be considered as nearly to demonstrate the existence of alcoholic insanity as any one group of symptoms in mental pathology can prove anything?—A. That is absolutely correct.''

Error is urged also in the asking of certain hypothetical questions by the prosecution, it being insisted that these questions contain elements not found in the evidence itself. It would unduly and uselessly prolong this to set forth these matters in detail, and it must suffice to say that an examination of the evidence in the case does not disclose that there was any unfairness or any hardship to appellant or to his case from the questions which were permitted. Nor do we perceive that the court erred in limiting the cross-examination of certain of the experts.

As to the alleged error in admitting the evidence of Drs. Bryant and Davisson, in that it called for a disclosure of privileged communications, not only was no such point or objection made at the trial, but the rule as to privileged communications between a party and his physician does not

apply in a criminal case. (*People* v. *West*, 106 Cal. 89.) Of a hypothetical question asked of Dr. Gardner, it is said that it contained a résumé of the acts of the defendant at the time of the shooting, and concluded by asking for the opinion of the witness as to whether the defendant was laboring under an insane delusion at the time of the act. The objection is highly technical and is not supported by the record itself. The question, after setting forth the evidence, as in an assumed case, concludes: "Now state whether or not in your opinion *such a subject* asking such questions, and acting in such a manner, was laboring under a delusion in respect to his wife's infidelity, or was laboring under a delusion in respect to poisoning." In every case where a hypothetical question is asked based upon the evidence, it is not to be presumed that the jury is so stupid as not to understand that it is addressed to the supposed acts, facts, and conditions of the defendant, and the answer which the witness gives to such hypothetical question must have its weight with the jury as bearing upon the defendant's individual case, or else the jury through their ignorance and density would be unfit to sit in any cause. But we cannot perceive in this question any just ground for complaint. It is true the facts embraced in the hypothetical question were the facts disclosed by the evidence, but the witness was not asked if, under these circumstances, the defendant was sane or insane. The interrogatory was based upon assumptions, and the question in conclusion was whether "such a subject" would be sane or insane, and not whether the defendant was sane or insane.

We have thus considered all the points which seem to call for special mention. Upon a review of the whole case we do not perceive that the defendant had other than a fair and impartial trial. The acts which he committed were brutal and unpardonable, excepting upon the theory of insanity. The jury seems to have concluded that he was legally sane and responsible for his acts, but seems further to have entertained a reasonable doubt as to whether or not he actually and deliberately did the shooting, or whether his crime ceased with the assault, and the actual shooting was the result of misadventure. It gave him the benefit of the doubt in this instance, and so convicted him of a lesser crime, and for the

reasons above given the judgment and order appealed from are affirmed.

McFarland, J., and Lorigan, J., concurred.

Hearing in Bank denied.