[Crim. No. 3429. Second Dist., Div. Two.—May 19, 1941.]

THE PEOPLE, Respondent, v. HARRY KNIGHT, Appellant.

888

A. Brigham Rose for Appellant.

Earl Warren, Attorney-General, Gilbert F. Nelson, Deputy Attorney-General, John F. Dockweiler, District Attorney, and Geo. H. Johnson, Deputy District Attorney, for Respondent.

WOOD, J.—Defendant was charged in count I of the information with the crime of robbery, with the additional charge that at the time of the commission of the offense he was armed with a deadly weapon. In count II he was charged with the crime of assault with a deadly weapon with intent to commit murder. He was also charged with the prior conviction of the crime of murder in the State of Missouri. At a jury trial he was convicted of the charges contained in count I and was also convicted of the crime of assault with a deadly weapon, an offense included in the charge contained in count II. Defendant denied the prior conviction of murder but the jury found this charge to be true. He has appealed from the judgment of conviction and from the order denying his motion for a new trial.

From the evidence presented by the prosecution it appears that defendant operated an establishment known as Boots and Saddles in the city of Los Angeles. This establishment consisted of a number of buildings, a cafe, a cocktail bar, a dwelling house, a club room and a stable containing a bunk room. Several persons lived on the premises with defendant, including Ray Marchant, who had an interest in the business, and Ella Neuhart, who was employed there as a waitress. The victim of the robbery, Emil Kast, a cousin of Ella Neuhart, arrived on the premises of Boots and Saddles on Friday, June 21, 1940, intending to stop over for a short visit on his way to Washington. He carried on his person two billfolds containing the sum of $260 or $270 in currency. The fact of his possession of this money was known by defendant, who had observed Kast assisting in the making of change for customers at the bar. The first night after his arrival Kast slept with Marchant in an attic of the house. At the suggestion of defendant, Kast went on Sunday morning to Los Angeles with Marchant and Mrs. Neuhart. Upon their return on Sunday evening defendant told Marchant that there had been a fire in the attic and that he and Kast could not sleep up there but that Kast would have to sleep with a man named Alvin Cowart in the stable and that Marchant could sleep with defendant in the club room. Kast and Cowart went to the stable to sleep and defendant and Marchant went to the club room, whereupon defendant told Marchant that since there had been a fire on the premises it would be best for him to

stay in the bar and "watch things". Marchant then went to bed in the club room.

Before Kast and Cowart went to bed in the double bed in the bunk room of the stable Kast put both of his billfolds inside his pillow. At about 2 A. M. in the morning Kast awakened and saw defendant running through the pockets of his coat which was lying by the bed. Kast sat up in bed and appellant left the room. Defendant returned shortly, opened the door and "waved to come out". Kast aroused Cowart, stating "your boss wants to see you outside". Cowart got up and left the room for a short period and returned to the bed. During this period Kast removed his billfolds from the pillow and placed them inside his underwear next to his body. In about ten minutes defendant returned to the bunk room and ordered Kast and Cowart to turn to the wall, threatening that he would shoot them with a pistol he held. Defendant poked Kast with the "gun" and demanded his money. Kast stated that he had given the money to Marchant but defendant replied, "Ray hasn't got the money", and began to feel about Kast's body. Kast took the billfolds in his hand while he sat up in bed and defendant struck him over the head with the gun. Kast testified: "When he kept on hitting me, I took the money—he started feeling around—felt around me in the bed, and I took the money out and held it in my hand, left hand, and I kind of sat up in bed a little, and he hit me over the head a couple of times. Then I tried to hold him off with one hand—I thought if I stalled around maybe he would go out, and then he kept on hitting me and poking me in the ribs and asking for the money. Then I sat up, and then he says, 'Lay down, you son-of-a-bitch', and then he hit me over the head, and I was kind of stunned a little and I dropped the money behind the bed, and he shot just as I laid down. Then I jumped up and grabbed for the gun—I had the gun in both hands and held it very tightly, and he was so strong he pushed me down and took the gun . . . he stooped right down, got the money and then went out". Kast went up the street a short distance to a filling station and called the sheriff's office. He was then taken to the receiving hospital.

One of the investigating officers testified that he dug a bullet from the wall in the bunk room about 2½ feet above the bed. An officer testified that he removed from the in-

cinerator on the premises of Boots and Saddles a charred piece of burned calendar which Kast identified as having been in his possession on the day before the night of the robbery. A photograph of this calendar was introduced in evidence.

Alvin Cowart corroborated the testimony of Kast as to the occurrences at the time of the robbery. He also testified that about daylight on the morning of the robbery defendant told him to clean out the incinerator where the calendar was later found but that he did not do so. On Monday afternoon Cowart was taken into custody by the police and released. He then met defendant, who gave him $56 with instructions that the money be given to a Mrs. Snyder, saying that if the officers came he did not want it to be on his person. Defendant then said, "That Dutch son-of-a-bitch didn't have but $208".

The contention of defendant that the evidence is insufficient to justify the conviction is devoid of merit. Defendant was identified as the robber by two witnesses, whose testimony is supported by a number of circumstances, including circumstances in addition to those above set forth, from which inferences of guilt could be reasonably deduced. Defendant refers to the fact that the lower part of the robber's face was covered with a cloth. This, however, does not nullify their testimony to the effect that they recognized him as the perpetrator of the crime. The strength or weakness of the identification is a matter for the determination of the jury. (*People* v. *Farrington,* 213 Cal. 459 [2 Pac. (2d) 814].)

Defendant contends that upon the examination of the prospective jurors concerning their qualifications the prior conviction of defendant of the crime of murder was unduly emphasized and he was thereby prevented from having a fair trial. The record discloses the following proceedings:

"Q. By Mr. Rose: Mr. Kennick, you entertain the same belief that Mr. Thedick does, that the fact that a person has been convicted of the crime of murder makes no impression, you would not be prejudiced against him in the absence of any explanation?

"Mr. Johnson: I object to that as contrary—

"The Court: Perhaps the question should be reformed a little. I will state this to the jurors generally, however: We are trying here the question as to whether the defendant

892

on this particular date, the 24th of June of this year, did a particular thing; what he may have done in the past, whether credible or not, does not shed any light on that. In other words, it would be wholly illogical to say that because a man did something twenty years ago it would be probable he did something today. The question of the guilt or innocence of the crime of robbery or the crime of assault, as charged in this information, is limited to evidence as to what happened on or about the 24th of June. The other matter is really a side issue. While the jury has to determine that, it should not be considered for any purpose in determining the guilt or innocence of the defendant.

"Mr. Rose: Your Honor, I take the position that it is abnormal for an individual in any walk of life, in all candor, to be uninfluenced by being informed that on some previous occasion a particular individual has suffered a conviction for the offense of murder, in the absence of some explanation of that offense. Now, I say to your Honor, and I take the legal position, that it is beyond the pale of—

"The Court: You are trying to argue the question of the admissibility of evidence as to the nature of what happened back sixteen years ago. However, I think the jury has indicated that they will not consider that in determining whether he committed a crime on the 24th of last June. The mere fact that a person may have been convicted of murder does not necessarily shed discredit upon the individual. I think it was Edgar Allen Poe who wrote a little story he called 'My Friend the Murderer'; that is my recollection; maybe my recollection fails me. The fact that a man may have been convicted of an offense, even the offense of murder, might not be discreditable, necessarily; the circumstances may be entirely otherwise. However, we are not concerned with that in this trial.

"Mr. Rose: I take the position that since that has been mentioned to the jury, I am entitled to elicit the state of mind of the juror, because it strikes me it is merely an idle act—

"The Court: You may ask him whether that allegation, whether it be established or not, could by any possibility have the slightest effect upon his determining the guilt or innocence of the defendant.

"Mr. Johnson: If your Honor please, what I had in mind was, it is proper for the jury to consider the felony conviction on the question of impeachment, regardless of this allegation.

"The Court: I don't think we had that in mind; I am sure Mr. Rose did not, and I did not. Of course, the jury has been previously instructed that a person who takes the witness stand, in person, whether it is the defendant or not, may be impeached by asking the question as to whether he has been convicted of a felony or not. If he answers he has, or it appears he has, the weight to be given to that prior felony conviction as reflecting upon his credibility, however, is a matter for the jury. The mere fact a person has been convicted, of course, does not discredit his testimony. I think we have covered that, Mr. Rose; I have tried to."

Before the examination of the jurors was commenced defendant had denied that he had been convicted of murder and the issue therefore was to be determined by the jury. It was proper for the counsel to interrogate the prospective jurors on their state of mind concerning all of the issues to be submitted to them. It appears that counsel for defendant was the first to interrogate on the subject of the prior conviction. His inaccurate use of the words "makes no impression" brought about an objection from opposing counsel. The court thereupon attempted to explain to the jurors the issue before them as regards the charge of the prior conviction and the fact that a prior felony conviction of a witness should be considered by the jury in passing upon his credibility. The court discharged its duty as required by section 1078 of the Penal Code and in doing so presented the issues to the jury in a manner which was fair to defendant, who was favored rather than prejudiced thereby. The knowledge that one has been convicted of murder arouses a feeling of abhorrence in the average citizen. The effect of the language of the court above quoted was to allay this feeling.

Defendant contends that the trial court erred in refusing to give to the jury several instructions which he had proposed. The first refused instruction of which complaint is made in defendant's brief is as follows: "The interest of a defendant in the result of the action does not deprive him of the benefit of his own testimony; the law makes him a competent witness in his own behalf, and his testimony is en-

titled to just and fair consideration by you, the same as that of any other witness, and is sufficient in itself, if it creates in your mind any reasonable doubt as to whether the crime charged was committed by the defendant, to entitle him to an acquittal at your hands''. The court gave full and fair general instructions on the credibility of witnesses. It has been held in a number of decisions that the trial court should not single out the testimony of defendant and give instructions with particular reference to it. (*People* v. *Barnett,* 99 Cal. App. 409 [278 Pac. 885]; *People* v. *Khan,* 92 Cal. App. 534 [268 Pac. 701]; *People* v. *Heath,* 79 Cal. App. 20 [248 Pac. 1027]; *People* v. *Adams,* 199 Cal. 361 [249 Pac. 186]; *People* v. *Harris,* 128 Cal. App. 44 [16 Pac. (2d) 688]; *People* v. *Miller,* 68 Cal. App. 758 [230 Pac. 191]; *People* v. *Langlois,* 68 Cal. App. 610 [230 Pac. 13].)

The contentions of defendant regarding the refusal to give other proposed instructions are not more meritorious than his contention with regard to the instruction above quoted. The jury was fully and fairly instructed by the court on all issues of law involved in the case.

■ Defendant argues that the court should have given of its own motion an instruction on the necessity for corroboration of the testimony of an accomplice, claiming that the witness Cowart was an accomplice. The evidence in the record is sufficient to sustain a conviction without the testimony of Cowart and, even if Cowart be considered an accomplice, which is denied by the prosecution, it is apparent that an instruction on the subject of the necessity for corroboration of an accomplice was unnecessary.

■ A number of instances are cited by defendant in which he claims that the prosecutor was guilty of prejudicial misconduct. The most serious complaint seems to be in the opening statement made to the jury by the prosecutor in which he stated: ''The evidence will show, I think, that this defendant boasted to people down there, especially to those he had working for him, that he had killed seventeen people.' The statement appears to have been made in good faith, for after the witness Marchant had testified that he had changed his residence because he was afraid of defendant, stating, ''He had threatened to get both Emil and I,'' the prosecutor asked this question: ''Now, Mr. Marchant, will you relate what Mr. Knight, the defendant, had told you on any occasion

about his having killed anybody." An objection to this question was sustained. The jury was admonished by the court to disregard the prosecutor's statement concerning the alleged boast of defendant that he had killed anyone. In view of the court's admonition we are satisfied that no prejudice was suffered by defendant.

Some of the instances of alleged misconduct resulted directly and naturally from statements which had been made by defense counsel. Other assignments of misconduct on the part of the prosecutor were, except in instances where they were without merit, followed by the admonition of the trial court to the jury to disregard them. They are not of such nature as to furnish grounds sufficient to justify a reversal of the judgment.

Defendant also contends that the trial judge was guilty of misconduct which prevented his having a fair trial. He apparently considers his most serious criticism to be that which he directs at the remarks of the court concerning the story entitled "My Friend the Murderer", for he commences his argument under this heading with the following: "It is to be noted that the top of page 3 of the record reflects the trial Judge as making some facetious observations about having read a story entitled, 'My Friend the Murderer'. We especially desire to call this Honorable Tribunal's attention to some of the particular observations of the Court, which we submit engendered a prejudice against the appellant in the minds of the jury. Consider, for example the following:

" 'Q. Did you observe anything with respect to the business and the money transactions around there?

" 'Mr. Rose: Just a moment. I object to that as leading and suggestive, and calling for a conclusion and opinion of the witness.

" 'The Court: Overruled.

" 'Mr. Rose: Just a moment, your Honor.

" 'The Court: Overruled.

" 'Mr. Rose: I have not completed my objection.

" 'The Court: Let us try another one. Those were not very good.

" 'Mr. Rose: No proper foundation laid as to whom this particular business belonged, and your Honor cannot assume it merely because the prosecutor has made that statement.

" 'The Court: I overrule the objection. You may proceed.

" 'Q. By Mr. Johnson: What did you see with respect to any money transactions in the bar room or the cafe?

" 'Mr. Rose: Objected to as indefinite, vague, calling for an opinion and conclusion of the witness, on the basis of *res inter alios acta.*

" ' The Court: That is a good 39-cent word, but it hasn't anything to do with the question. When you ask a man what he sees, that does not call for a conclusion; that is direct testimony; it is not even circumstantial. Objection overruled.

" 'Mr. Rose: Your Honor, if you want me to—

" 'The Court: I am ruling the objection is overruled, and please understand when I overrule the objection the District Attorney may go ahead. We are wasting a lot of time. If I am wrong you have the benefit of your objection.

" 'Mr. Rose: I want to protect the record.

" 'The Court: That is all right; you can protect it, but not by continuing to argue after I have ruled. You may proceed.' "

As hereinabove indicated we perceive no impropriety in the court's remarks on the subject of the story referred to; nor do we find error in the court's actions in the matter set out in defendant's brief which we have just quoted.

Defendant asserts that "the attitude of the trial judge was hostile throughout the trial". The record fails to bear out this assertion but it discloses a commendable effort on the part of the judge to conduct the trial in an orderly manner. During the progress of the trial defense counsel repeatedly referred to the deputy district attorney as "this so-called counsel", "this so-called attorney" and in other ways brought about admonitions from the trial court concerning his own conduct. The following appears in the reporter's transcript: "Q. Being a seaman, you could climb a ladder, could you? A. Yes. Mr. Rose: Very clever. The Court: Mr. Rose, I am going to admonish you that I do not want any more wise cracks. If you want to make any remarks, something in the nature of objections, do so. I am not going to have any comments here, or I am going to take disciplinary action. I am getting thoroughly tired of it."

At one stage of the trial the court ordered defense counsel "to stay away from a position between counsel for the prosecution and the jury". On another occasion the court felt compelled to admonish counsel, "Mr. Rose, now, I have a perfectly good means of compelling you to modulate your voice; I do not want to utilize it. I think you should have enough self-control, at your age, to keep your voice down within a reasonable conversational tone. Standing within about an arm's length of the jury, you are shouting in a tone of voice, and I want the record to show it does happen repeatedly, which is extremely irritating not only to the court but must be extremely irritating to the jury. I think out of consideration for the jury, if you have no consideration for the court, you should desist. You may proceed."

A lack of respect toward the court breeds contempt for our system of jurisprudence. It is the duty of the trial judge to see that trials are conducted in an orderly and respectful manner. The statements and rulings of the trial judge, of which complaint is now made, were brought about by the improper conduct of defense counsel and we find nothing therein which can legitimately be made the subject of adverse criticism. Defense counsel may not by his own improper conduct goad the judge into taking disciplinary action and thereafter obtain a reversal of the judgment of conviction because of the rulings which he has brought upon himself.

Other assignments of error are made by defendant. They are without merit and are not of sufficient importance to call for discussion herein.

 The improper conduct in which defense counsel indulged during the trial has been continued in this court. He has filed a brief in which he refers to "the despicable manner in which the trial was conducted", "the so-called trial" and the "star chamber proceedings and the methods of medieval times". He repeatedly refers therein to opposing counsel as "the so-denominated deputy district attorney". After the oral argument he sent to the presiding justice of this court a letter under date of April 19, 1941, accompanied by several small calendars which he claims are of the type of the partially burned calendar found in the incinerator on defendant's premises, and which he asserts "can be had almost as easily

as grapenuts''. It was improper to send the letter and the calendars. It is ordered that they be stricken from the files.

The judgment and the order denying a new trial are affirmed.

Moore, P. J., and McComb, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 18, 1941.