[Crim. No. 4015. Second Dist., Div. One. Oct. 3, 1946.]

THE PEOPLE, Respondent, v. CHARLES. E. HILL, Appellant.

Henry Poyet for Appellant.

Robert W. Kenny, Attorney General, Frank W. Richards, Deputy Attorney General, Fred N. Howser, District Attorney, and Jere J. Sullivan and Robert Wheeler, Deputies District Attorney, for Respondent.

WHITE, J.—The district attorney filed an information in the Superior Court of Los Angeles County wherein the defendant was charged with the commission of five (5) felonies as follows:

Count 1: Kidnapping;

Counts 2 and 5: Rape;

Counts 3 and 4: Violation of section 288a of the Penal Code.

Trial before a jury resulted in the conviction of defendant on all five counts. A motion for a new trial was denied and defendant was sentenced to state prison for the terms prescribed by law on all counts, the sentences to run concurrently.

From the judgment of conviction and the order denying motion for a new trial, defendant prosecutes this appeal.

Because the sole ground of appeal is that the court erred in refusing certain instructions offered by the defendant, we do not deem it necessary to here recite in detail the sordid circumstances which gave rise to this prosecution. The evidence pertinent to a consideration of this appeal may be thus epitomized:

Between 9 and 10 o'clock on the evening of September 20, 1945, the prosecutrix, a woman divorced from her husband and the mother of two children aged 8 and 6 years, was sitting with a male companion in the latter's parked automobile on a public scenic drive in the Palos Verdes Hills in Los Angeles County. Defendant approached the automobile on the side where the man was sitting behind the steering wheel, opened the door and shoved an object into the man's side, whereupon the latter told the prosecutrix seated beside him to run away. She ran about half way down the hill on the asphalt road, turned up a bank to a bush behind which she secreted herself. She heard the defendant following her, and when he too turned running off the road she ran to the other side of the bush, down the bank, and across the road. The defendant continued to pursue her, calling out, "You stop or I'll kill you."

When the defendant was within 8 or 10 feet behind her, the prosecutrix stopped. Walking up to him she observed that he had a flat, gunmetal-colored revolver in his right hand. When the prosecutrix inquired of the defendant what he wanted, he told her to "shut up"; that he was not a "cop" and that "you will find out what I want." The defendant then turned the prosecutrix around, put the gun "behind my heart, in my back" and asked her to go back to the automobile or "I'll plug you here." The prosecutrix testified that she was "desperately afraid" of the defendant's gun, and that "by the tone of his voice and the way that he was acting" the prosecutrix testified she "didn't doubt for one instant" that he would shoot her if she failed to obey him.

With the defendant behind her, holding her left arm, and with the gun pressed against her back, the prosecutrix, in obedience to the defendant's command, and with him "pushing and shoving" her, proceeded back to her companion's automobile.

When the defendant and prosecutrix arrived at her companion's automobile he was not in sight and did not respond to calls for him uttered by the prosecutrix. There is testimony that the defendant was very nervous and highly excited, that he insisted to the prosecutrix that if she did not get her male companion back to the car he would shoot her then and there. At this time, defendant was still holding his gun to her back. After the prosecutrix, at the defendant's command, made fur-

ther outcries for her companion, the latter came from behind the car with his hands up.

Defendant told him that he did not want money but wanted the woman and that he would kill her companion if the latter came any closer. Defendant threatened "very often" to kill the companion of the prosecutrix and finally instructed him to stay at the car for 50 minutes and to then come to a spot at the end of the road where he would find his automobile keys.

The defendant again emphasized that if the man did not remain at the automobile he, the defendant, would kill the prosecutrix. During all of his talking, the defendant continued to keep his gun pressed to the prosecutrix's back, and, according to her testimony, she was at all times in fear and apprehension that defendant would shoot her companion if she and the defendant stayed at the automobile. She thereupon said to the defendant, "If it is me you want, let's go."

After proceeding some 50 feet, the defendant turned the prosecutrix off the road, took her across a field and up a hill. He inquired of her as to whether she was married to her companion, to which she replied in the negative, and told the defendant her companion was her boss.

At the top of the hill, about a block from the aforesaid automobile, the defendant commanded the prosecutrix to get in the front seat of another automobile and drove off with her, circling around the hills for "a long time." All of this time, the prosecutrix testified, she was trying to talk to the defendant but that the latter was "very brutal in his voice" telling her that he did not intend to bring her back as she would "squeal" on him and that, therefore, he would kill her where they were. According to the testimony of the prosecutrix, her one thought was to convince the defendant that she would not "tell on him" and she so stated to him. She thereupon suggested that she and the defendant go to a beer parlor or to his apartment, which invitation the defendant refused. She then told the defendant of her children. During all of this time, according to her testimony, the prosecutrix was frightened "practically out of her wits." While in the automobile the defendant kept his gun in the front of his unbuttoned shirt. He drove around the hills for about 30 minutes, never on the highway, and then drove the car off into and across a large Decalite pit hewn from the side of a hill, and to a lonely spot overgrown with weeds with room for just one automobile going one way. There were no houses or people around nor were any house lights to be seen. At this point the defen-

dant said, "Here is where I get some of that loving." At defendant's command, made while he had a gun in his hand, the prosecutrix practically disrobed. She testified she did so because of her fear of the defendant and the thought that he would kill her if she refused. Thereupon, defendant consummated the acts forming the basis of counts 2, 3, 4 and 5. After the consummation of the aforesaid acts, defendant stated to the prosecutrix that she was "pretty nice" and that he wanted her address and telephone number. Fearful of consequences that might ensue if she refused this request, she gave the defendant the requested information as well as the name of the place where her former husband had worked and also the address of her companion. Defendant stated to the prosecutrix that he could probably get her a better job than she had. He then drove her past her house and, at about 11 o'clock, to within half a block of her sister's house.

Defendant told the prosecutrix that if she reported him to the police, he would kill her or disfigure her by throwing acid upon her when he got out of prison. He further told her that he would be back in four or five nights and that he intended to keep in touch with her. After that he compelled her to kiss him, whereupon she turned and walked to her sister's house while the defendant drove away. Immediately upon admission into her sister's house the prosecutrix made complaint of the defendant's conduct. The prosecutrix was then driven by a friend Gene Baker back to the hills where they found the companion of the prosecutrix circling about with his car. The prosecutrix testified that she was then driven home and did not call the police immediately because she was "too mentally sick."

The following morning, at about 11:50 o'clock, the defendant telephoned the prosecutrix at her house. He wanted to see her again, but she told him she was too tired and nervous and that she was having a birthday party next day, Saturday, for her little boy. Defendant insisted upon seeing her Sunday, to which she agreed. Immediately after this telephone conversation, the prosecutrix communicated with the police. She testified that she was ill and went to bed where she stayed until the next morning, September 22, when she consulted her family physician. Upon her return from the doctor's office, the prosecutrix observed the defendant drive by her house smiling at her. Shortly thereafter he telephoned to the prosecutrix saying that he was scared, was getting nervous, had

to see her right away, and would be over in five minutes. According to the testimony of prosecutrix, she agreed to his coming, in order to aid in his apprehension. Immediately after this conversation, the prosecutrix again telephoned the police department. In less than five minutes, the defendant arrived and a few minutes thereafter the officers were on the scene. The defendant was taken into custody. The prosecutrix went out to the police car and identified defendant as her assailant. At the trial the prosecutrix identified the gun that the defendant pressed against her back and which, at times, he carried in his shirt, and also another gun which the defendant had in his automobile and had exhibited to her.

The male companion of the prosecutrix testified at the trial. He corroborated the testimony of the prosecutrix as to what occurred at all times when he was present.

On the day of the defendant's arrest, one Gene Baker testified that he saw the defendant drive by the prosecutrix's home twice and that, after the defendant parked in front of the home of the prosecutrix and upon the approach of Mr. Baker, he seemed about to drive away, the latter, with a shotgun, blew the rear tire off the defendant's automobile. At the time of his arrest, the defendant had with him a tear gas bomb, which was introduced into evidence. At the same time, defendant's Colt automatic with a shell in the firing chamber, was found in the rear of the front seat cushion of his automobile, shoved down between the back cushion and the seat cushion with the butt protruding up, while a fully loaded clip of cartridges was found in the glove compartment. Also found in the vehicle was his fully loaded 30-20 revolver stuck down and just to the left of where the driver would sit in the car and between the front seat frame and the cushion.

Subsequent to his arrest, the defendant had conversations, in the presence of several persons, with a Los Angeles police officer, the Chief of Police of Torrance, and a deputy sheriff of Los Angeles County. While waiting in the automobile at the scene of his arrest, the defendant stated, ''I'm the guy you are after . . . I am the guy that had the girl up in the hills.'' At the Torrance Police Station the defendant stated that he had sexual intercourse with the prosecutrix at the Decalite pit and had her commit upon him an act of sexual perversion. As to the latter, when asked if he had to force her, he said, ''I had to push her head down.'' At the Vermont substation of the sheriff's office, the defendant stated that at

the Decalite pit he had engaged in an act of sexual intercourse with the prosecutrix, that he then committed an act of sexual perversion upon her, that he then had her commit a similar act upon himself, and that he then had another act of sexual intercourse with her. At this point the defendant was asked, "Was this all done by the girl's own free will?" to which the defendant replied, "I guess it was all by force."

At the trial, the defendant introduced the testimony of a private investigator who stated that on November 25, 1945, he saw a man take a woman from the apartment of the prosecutrix, drive her to the beach, where it appeared to him that "a loving affair was had in the automobile," but when the prosecutrix stood some 14 feet from the witness stand the investigator was not positive that she was the woman he had seen, nor could he identify the man. The witness admitted he might have confused the woman with the sister of the prosecutrix who was also in court and confronted him. The sister of the prosecutrix testified that it was she who had been driven to the beach, and the man who accompanied her testified that it was she and not the prosecutrix with whom he was keeping company and whom he took to the beach on the occasion in question, at which time the prosecutrix remained in her own apartment. The witness testified that in fact, the prosecutrix never at any time was in his automobile.

The defendant testified at the trial that as he drove by the car in which the prosecutrix and her male companion were sitting, he thought a fight was in progress, though he did not hear anything. After proceeding to the top of the hill he turned around, parked about 100 yards from the automobile in which the prosecutrix was seated, took his gun, flashlight and a handful of dirt. He testified that when he arrived at the car the man was in the back thereof buttoning up his trousers, that he threw the sand or dirt in the man's face when it appeared that the latter was going to rush him. Defendant stated that the prosecutrix ran away from the automobile, that he did not know her name to call her so we went after her. He testified that he encountered her and they walked back to the automobile, during which time the prosecutrix stated to him that the man she was with was her foreman, that she was desperately in need of money and that was the only reason she was out with him. According to the defendant, the prosecutrix asked him, "What do you want? Money?" to which he said, "No; I don't want money; I don't want a

thing. I just thought you was in trouble." That the prosecutrix thereupon said, "You couldn't use some loving now, could you?" According to the defendant, he said, "Well, no, not hardly; I don't think so." to which, according to his testimony, the prosecutrix replied, "I can fix you up if you do."

Defendant testified that when they reached the automobile he pulled his gun when the male companion of the prosecutrix came from behind the automobile after she had called him. That the prosecutrix suggested that she and the defendant leave and not have any trouble. Defendant testified that he started backing away and she followed him and entered his automobile. That the prosecutrix suggested that they go to his apartment but that he said, "No, we can't go to my apartment. I know a place we can go to I guess." That he then drove to the spot in the Decalite pit where they, with her consent, engaged in an act of sexual intercourse. The defendant denied committing any acts of sexual perversion upon or with the prosecutrix. In detailing the manner in which he obtained her telephone number, he testified that they made an engagement to meet the following Sunday. In explanation of his telephone call on the following day, he said that it was with reference to his promise to obtain a position for her. He admitted driving by the home of the prosecutrix and exchanging smiles with her. He also admitted the telephone conversation with her and testified that she invited him to come over to her house, which he did. That he was there met by two men, one with a shotgun, that his rear tire was shot off, that he was knocked down by one of the men and shortly thereafter the police arrived and took him into custody.

While testifying that the officers were not "rough" in questioning him, the defendant at the trial could remember only "snatches" of the questions asked of him and the answers given by him because he said that he was ill, "half-way dizzy" and had "a terrific headache."

In urging a reversal of the judgments and order herein, appellant states, "When the evidence, as in this case, is of such an unusual and unique character, the court should extend themselves to see that juries have in mind these broad principles of law in simple and concise language as was offered in these instructions and should not be compelled upon their own to apply deductions and inferences which some general instructions may inferentially be held to apply when profound and intricate theories must be supplied in order to

make them appear legally sufficient. It is our contention that none of the instructions which the court gave to the jury would direct a jury to a consideration of the defendant's defense." As to what appellant's defense was, it would appear from a reading of the record that in substance, as reflected by his own testimony, his defense was that the prosecutrix voluntarily left her male companion, willingly accompanied the defendant whom she had never before met, to a lonely spot in the hills, where she made advances to him and solicited from him acts of sexual intercourse, or as stated in appellant's brief, "he of course fell for seduction, was seduced and finds himself in his present position." As to the charges of kidnapping and violations of section 288a of the Penal Code, he denied that he committed any of the acts forming the gravamen of these offenses. The evidence introduced by the prosecution and evidently believed by the jury, was amply sufficient to prove the offenses charged. Indeed, it is not here contended that the evidence fails to support the guilty verdicts rendered. True, the evidence introduced for the defense created a conflict, but that was a question addressed to the triers of fact for solution and with their determination we cannot interfere.

It therefore becomes our duty to determine whether the instructions given, fully, fairly and correctly advised the jury of the law applicable to the issues presented by the information and pleas of the defendant or raised by the evidence.

■ Appellant's first refused instruction pertains to the presumption of innocence, the doctrine of reasonable doubt, and emphasizes the fact that the presumption of innocence is not a mere form to be lightly disregarded, but is an essential and substantial part of the law of the land. The court instructed the jury on the doctrine of reasonable doubt and the presumption of innocence in the language of section 1096 of the Penal Code. Section 1096a of the same code specifically provides that no further instructions on these subjects need be given.

■ The second refused instruction was to the effect that a defendant is entitled to the individual opinion of each juror. This instruction was properly refused because it was covered by another instruction which advised the jury that they must reach a verdict just to both sides "and which will express the individual opinion of each juror." (See, also, *People* v. *Daskam,* 123 Cal.App. 545, 546 [11 P.2d 670].)

■ The next rejected instruction to the effect that the law presumes a defendant to be of good character, was properly refused. There is no such presumption (*People* v. *Griffith,* 146 Cal. 339, 345 [80 P. 68]; *People* v. *Conte,* 17 Cal. App. 771, 787 [122 P. 450]; *People* v. *Grandi,* 33 Cal.App. 637, 642 [165 P. 1027]; *People* v. *Hopper,* 42 Cal.App. 499, 502 [183 P. 536]; *People* v. *Oakleaf,* 66 Cal.App. 314, 317 [226 P. 24]). The court did instruct the jury that the defendant was presumed to be innocent until his guilt was established by evidence beyond a reasonable doubt.

A defendant's good reputation as to traits involved in the charges against him, if proved, should be weighed as any other fact established (*People* v. *Griffith, supra,* p. 345).

In the instant case, such evidence was offered and the court instructed the jury that "evidence of good character is evidence relevant to the question of whether the defendant is guilty or not guilty, and is to be considered by you in connection with the other facts and circumstances in the case. Such evidence may raise a reasonable doubt in a case in which otherwise no such doubt would exist. . . ."

■ The fourth and fifth instructions refused pertained to the credibility of witnesses. For the reason that in lengthy instructions the court fully covered this subject, defendant's proffered instructions, which in great part amounted to mere repetition and argument, were properly refused.

■ Appellant offered instructions number seven and sixteen to the effect that the opinion or remarks of the deputy district attorney that the defendant is guilty, or any statements of counsel, should not be considered by the jury. These were properly refused. It is not contended and the record does not disclose that the deputy district attorney expressed any such opinion or made any such remarks. Furthermore, the court instructed the jury that they should be careful not to regard statements by counsel on either side concerning the facts of the case as evidence.

The case of *People* v. *Knight,* 44 Cal.App.2d 887, 893, 894 [113 P.2d 226], is authority for refusal by the court of defendant's proposed instructions pertaining to the credibility of appellant as a witness in his own behalf. Further, the court fully instructed the jury on the credibility of witnesses.

■ Instructions offered by the defendant numbered six, nine, ten, eleven and thirteen covering the doctrine of reasonable doubt and the presumption of innocence were properly

refused because, as heretofore stated, both doctrines were clearly and fairly presented to the jury in other instructions.

Defendant's instruction number fourteen to the effect that the filing of an information did not constitute evidence of guilt was fully covered in another instruction by which the jury was admonished that, "The information is merely the formal charges against the defendant. It is not evidence and must in no degree be considered as such." The instruction given was taken from *People* v. *Phillips,* 56 Cal.App. 291, 294 [205 P. 40].

Appellant complains of the refusal of the court to give his proffered instruction to the effect that if the evidence presented two sets of facts or circumstances, one tending to establish the defendant's innocence and the other his guilt, the jury should adopt that hypothesis tending to establish his innocence. No prejudicial error was committed in rejecting this instruction. The court fully covered this subject in other instructions. Furthermore, where the proof, as in this case, was not entirely or even substantially circumstantial, no error was committed in rejecting the instruction offered (*People* v. *Savage,* 66 Cal.App.2d 237, 247 [152 P.2d 240]).

Appellant also complains of the refusal of the court to give his proffered instructions numbers seventeen and eighteen to the effect that such charges as rape and violation of section 288a of the Penal Code are easy to make, and difficult to disprove, and that the jury must exercise the utmost care and caution in examining the evidence in cases of this kind and should view the testimony of the prosecutrix with caution. These instructions were properly refused because they were covered by another instruction in which the court admonished the jury that "charges of the nature involved in this case can easily be made and are often difficult to disprove. I instruct you that it is your duty to examine with caution the testimony of the prosecuting witness." Furthermore, in the case at bar, where the evidence of the prosecution was credibly and impressively corroborated it would not have been prejudicial error had the court refused to give any cautionary instructions (*People* v. *Roberts,* 50 Cal.App.2d 558, 568, 569 [123 P.2d 628]).

Other instructions offered by appellant were either varying forms of the statements of law, as presented in other instructions given by the court, and therefore needless repetition, or they were mere arguments and, therefore, out of place.

It is not proper to select certain material facts, or those which are deemed to be material, and endeavor to force the court to indicate an opinion favorable to the defendant as to the effect of such facts, by incorporating them into instructions containing a correct principle of law. Such practice amounts simply to a request for the court to comment on the facts as disclosed by the evidence. While section 1127 of the Penal Code provides that the court "may make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the case," the same code section emphatically declares that "Either party may present to the court any written charge on the law, *but not with respect to matters of fact.* . . ." (Emphasis added.) Therefore, instructions bearing on the weight to be attached to a particular piece of evidence are properly refused.

In the instant case, the court correctly, fully and fairly instructed the jury on the definition of kidnapping, rape, and what constituted a violation of section 288a of the Penal Code. Defendant offered instructions amplifying these instructions with what could well be referred to as mere argument upon the question of the use of force or violence or the presence or absence of fear on the part of the prosecutrix. Such instructions were properly rejected. For illustration, after the crime of kidnapping had been succinctly defined by the court in the language of the statute, what could be the virtue of following such definition with a statement that if the alleged victim went with the defendant willingly and without any force, threats or violence on his part, the jury should acquit?

We do not deem it necessary to here set forth in detail some six other instructions offered by the defendant and refused by the court, for to do so would unduly prolong this opinion. Suffice it to say that a complete answer to the contentions advanced by the appellant herein with reference to instructions offered by him and refused by the court, is found in the case of *People* v. *Bickerstaff*, 46 Cal.App. 764 [190 P. 656], cited by appellant, wherein the Supreme Court in denying a petition for hearing, stated at page 775: "We think it necessary to say, however, that we do not approve of all that is said in the opinion of the district court of appeal on the subject of the instructions given and refused.

"The opinion appears to approve the pernicious practice

sometimes indulged in by the trial courts of repeating, over and over again, instructions couched in varying language, but embodying the same principle of law. This is especially prevalent with regard to instructions relating to the presumption of innocence, reasonable doubt, and the degree of proof required of the prosecution. Repetitions of this character are not necessary and should be avoided as far as possible. Several of the instructions criticised in this case were given, in effect, in other instructions using somewhat different forms of expression but having the same meaning. The trial judge should take care to give to the jury, once in clear language, every principle of law applicable to the particular case. When he has done this, he is not required to repeat any of them, no matter how many separate instructions are asked which may include them. Such continual repetition tends to give undue emphasis to the particular point to which they may relate and operates to confuse the jury in their consideration of the evidence.''

 In the case with which we are here concerned, the court in its instructions defined the offenses of kidnapping, rape and violation of section 288a of the Penal Code charged in the information. The court also defined an accomplice with reference to the charged violation of section 288a and gave instructions on the presumption of innocence, reasonable doubt, credibility of witnesses, and the degree of proof required to warrant a conviction. The jury was also instructed to view with caution testimony of the prosecutrix, that the jury in determining the guilt or innocence of the defendant must not consider the fact that he was armed with a deadly weapon unless the jury should find that such weapon was actually used by the defendant in a threatening manner toward the prosecutrix and her male companion and as an element of force to compel the former to go with defendant, against her will, and commit the acts included in the charges. The instructions given by the court sufficiently advised the jury of the law applicable to the issues confronting them. Where, as here, the jury was properly instructed upon all phases of the law applicable to the facts in the case, the defendant is not entitled to have instructions on like matters given in any particular phraseology (*People* v. *Tedesco*, 1 Cal.2d 211, 220 [34 P.2d 467]). Instructions should not be considered singly, but in their entirety. A reading of all the instructions given persuades us that the trial judge fully, fairly and cor-

rectly advised the jury as to the kind, quality and degree of proof required before appellant could be convicted of any or all of the charges lodged against him. This is all the law requires (*People* v. *Curtis,* 36 Cal.App.2d 306, 322 [98 P.2d 228]).

We have now given consideration to all the reasons and arguments advanced for a reversal, and having fully examined and considered the whole record, have found no reason for setting at naught the result arrived at in the court below.

The judgments and the order denying defendant's motion for a new trial are and each is accordingly affirmed.

York, P. J., and Doran, J., concurred.