[Crim. No. 3399. In Bank.—March 17, 1931.]

THE PEOPLE, Respondent, v. JOE BORREGO, Appellant.

Elliott H. Barrett for Appellant.

U. S. Webb, Attorney-General, John W. Maltman, Deputy Attorney-General, and Warner I. Praul for Respondent.

THE COURT.—This cause was originally appealed to the District Court of Appeal where it was heard, and by a divided court the judgment of the trial court was reversed. Upon petition of the attorney-general, we ordered a transfer

to this court. After due consideration given to the opinions rendered by the members of the District Court of Appeal at the time this cause was before said court, we are satisfied that the dissenting opinion, written by Gates, Justice *pro tem.*, correctly states the views of this court upon the questions presented by this appeal. We, therefore, adopt the following portions of said opinion as the opinion of this court:

"On the evening of December 13, 1929, at about nine P. M., of that day, an investigator and other members of the enforcement squad of the district attorney's office called at a residence on Warfield avenue, Los Angeles. Upon their arrival at the above place, they saw one of the defendants, Octeau, walking from the driveway. One of the officers took him by the arm and walked into the house. In the house they found in the kitchen a still, with condenser, coil and gooseneck. In the next room they discovered a pressure tank with some sugar and empty one-gallon bottles. In the front room and front bedrooms, around the walls, were sixteen fifty-gallon barrels of mash. In the front living room were two fifteen-gallon barrels of whisky, and also forty-five gallons of whisky and brandy. According to the People's witness, the still was operated by gasoline burners, and was capable of producing intoxicating liquor containing more than one-half of one per cent by volume fit for beverage purposes. Defendant Octeau told the officers if they would permit him to remain outside, others connected with the still would soon drive up; that he was only the watchman. The officers permitted him to remain outside. Presently a Chevrolet coupe arrived outside the house, the occupants of which were the appellant, his wife, and defendant Cotton. These people were immediately placed under arrest. On the back seat of the car driven by appellant was found People's exhibit 2. From a personal inspection of this exhibit, it appears that it is not a single ordinary piece of pipe, but consists of three separate and distinct pieces, which are screwed together, viz.: First, a one-inch by six-inch galvanized iron nipple; second, a one-inch by three-quarter inch reducer; and third, a three-quarter inch standard male hose nipple. The evidence clearly showed that this exhibit was not a piece of pipe that might be used for any purpose, but on the contrary, it fitted

perfectly into a connection on top of the mash pump, which pump was a part of the still found on the premises. The one-inch by six-inch galvanized iron nipple screwed into the mash pump, one end of the reducer fitted into the galvanized iron nipple, and the other end of the reducer, the smaller end, fitted into the mash hose. In addition to People's exhibit 2, there was taken from appellant's car two five-gallon cans of gasoline, which appellant stated he had purchased for his truck but had forgotten. It also appeared from the evidence that without the addition of People's exhibit 2, the connection above referred to, the still found on the premises was usable, but with the addition of People's exhibit 2 it became a more complete and efficient still—one easier to operate. This is illustrated by the testimony of officer Summers, a portion of whose testimony is as follows:

" 'A. "I took the piece of pipe (People's Exhibit 2) from McDonnell.'' (The investigator who had previously taken the piece of pipe [People's Exhibit 2] from appellant's car.)

" 'Q. By Mr. Holland: "People's Exhibit 2?''

" 'A. "Yes, sir,—and screwed an iron connection which had been on the table in the kitchen—and screwed that onto the mash pump.''

" 'Q. "Will you show the jury that connection, please?''

" 'A. (Illustrating.) "Screwed that into the mash pump and then screwed the piece of pipe (People's Exhibit 2) into that connection and then attached the mash hose onto the other end of the reducer, and there we had a complete outfit for the operation of this still, but without that piece of pipe (People's Exhibit 2) we would have not been able to.''

" 'Q. By Mr. Reams: "You mean pump?''

" 'A. "You would have a hard time running that still if you hadn't that mash pump.''

" 'Q. By the Court: "You referred to a complete still. You mean a complete pump?''

" 'A. "Yes. This piece of pipe (People's Exhibit 2) was the one thing missing to make this still and this pump and this apparatus complete, and without that (People's Exhibit 2) you would have had to pour your mash with a bucket into the still, but with that piece of pipe (People's

Exhibit 2) you could pump it in, which is the customary way." '

·"It also appeared that the defendant Octeau rented the. premises under an assumed name while in the company of. the defendant Cotton. Appellant and Cotton were acquainted with each other. Octeau admitted ownership of the still, after having first claimed that he was the watchman on the premises. Appellant denied having any interest in the still. His story was that he met the defendant Cotton on Warfield avenue on his way home from work. He offered to help Cotton, who had a flat tire. That he took him over to Twenty-eighth street to get his key to his spare tire. That when they came near the house in question, he was arrested by officer McDonnell. He was taken inside of the house and questioned. It is also shown by the evidence that upon being interrogated by the officers as to the use of People's exhibit 2, he stated that it might be used for a lot of things. People's exhibit 2 was on the back seat of his car. He stated that he got it from a plumber who works for the Edison company. That he took this particular connection (People's exhibit 2) around, thinking that he might need it. He did not state for what purpose he might need it. He also stated that he had the gasoline in the car to use; that it had been there for about ten days.

"It further appears from the evidence that appellant, in traveling on Warfield avenue, which is not a through main street, was driving out of his ordinary course or way from his work to his home. Appellant first denied that he knew Cotton, but later, when it was shown that appellant and Cotton resided about a year before at the same address, he admitted he knew him.

█ "Appellant's contention that the still found on the premises had not been completely set up is met by the evidence that the still was complete and could have been used for the purpose for which it was intended, but that without the addition of People's exhibit 2 it would not have been as efficient. █ Irrespective of whether this still was a completed still, it is immaterial, for it is well settled that the ◦ offense of possession of a still is established where it is shown that all of the parts are in the possession and immediate control of a person ready to be connected up and used. (*Bradley* v. *State,* 171 Ark. 1083 [287 S. W. 387] ; Mc-

*Garity* v. *State,* 151 Ark. 423 [236 S. W. 611]; *Gamble* v. *State,* 19 Ala. App. 82 [95 South. 202].) Appellant insists that People's exhibit 2 is not such a portion of a still as to come within the terms of the statute. *It must be borne in mind that appellant was not convicted of having a part or parts of something that might be used in connection with a still in his possession. He was tried and convicted with his codefendants of having in his possession a still,* the still found on the premises. Appellant's contention, however, would be tenable if he had been found with People's exhibit 2 in his possession and there was no other evidence to connect him and People's exhibit 2 with the particular still found on the premises. However, the fact that appellant had in his possession these three connected pieces of pipe (People's exhibit 2), which unquestionably, to my mind, is and was intended to be a component part of this particular still, which part fitted perfectly into the still found on the premises; together with the fact that he had in his possession two five-gallon cans of gasoline, gasoline being the only fuel with which the still could be operated; these facts, together with his lack of explanation, acquaintance with codefendants, the fact that the still was ready for use and that the only things lacking to effectively and efficiently operate it were People's exhibit 2 and the gasoline to fire it up, which were both brought by appellant, without any explanation on his part that the articles did not belong to him, are sufficient circumstances in themselves to warrant the jury in finding appellant guilty of aiding and abetting his codefendants in possession of the still found on the premises.

"It is well settled that where one has been charged with the unlawful manufacture of intoxicating liquor, that it is proper to permit parts carried by the defendant to be put together, in the presence of the jury, with other parts found with a still, to determine whether they belonged together, and the value of this evidence is for the jury. (*Hixson* v. *State,* 158 Ark. 642 [239 S. W. 1057].)

"It is also clear that one may be guilty of aiding and abetting another in the possession of a still. (*Washington* v. *State,* 21 Ala. App. 239 [107 South. 34].) And likewise, it is well established by the cases that a defendant's connection with a crime of this kind may be

shown either by positive proof or by circumstantial evidence which excludes every other reasonable hypothesis except that of guilt. (33 C. J. 777.) It was stated by this court in *People* v. *Baker*, 94 Cal. App. 628 [271 Pac. 765, 767], that 'Circumstantial evidence need not, in order to justify the inference of legal guilt, consist of inculpatory facts which are absolutely and to the point of demonstration incompatible with innocence. "A conviction in the minds of the jurors to a moral certainty and beyond a reasonable doubt, arising from the evidence of the defendant's guilt, is sufficient." (*People* v. *Bellamy*, 109 Cal. 610 [42 Pac. 236].) Circumstantial evidence may be as conclusive in its convincing force as the testimony of direct witnesses to the overt act. "Circumstances very largely control the conduct of men in the most important affairs of life, and may be sufficient to justify a conviction of crime where they are such as to exclude any other reasonable theory than that of the guilt of the accused." (*People* v. *Nagy*, 199 Cal. 235 [248 Pac. 906].)'

"The District Court of Appeal, in *People* v. *Kiser*, 24 Cal. App. 540 [141 Pac. 1078], has enunciated the principle that the direct testimony of the accused may be so contradicted by circumstantial evidence alone that the jury need not believe it. ▮ And, also, it is a well-settled principle of law in this state that although the defendant's own story exculpates him, it is for the jury to say whether that story should be believed. (*People* v. *Rongo*, 169 Cal. 71 [145 Pac. 145]; *People* v. *Sears*, 119 Cal. 267 [51 Pac. 325]; *People* v. *Billings*, 34 Cal. App. 549 [168 Pac. 396]; *People* v. *Stephens*, 29 Cal. App. 616 [157 Pac. 570].)

"In the instant case the jury's verdict indicates that they did not believe the appellant's story; the effect of this finding being that the testimony of the appellant, positive though it seems to be, is contradicted by this circumstantial evidence, which evidence, to my mind, is amply sufficient to support the verdict of guilt."

The judgment is affirmed.