[Crim. No. 4259.    Second Dist., Div. One.    Mar. 15, 1949.]

THE PEOPLE, Respondent, v. DAMON WILLIAM KLINK-
ENBERG et al., Defendants; MARJORIE MAY MAS-
SOW et al., Appellants.

Albert William Tucker in pro. per., and Fink, Rolston, Levinthal & Kent for Appellants.

Fred N. Howser, Attorney General, Henry A. Dietz, Deputy Attorney General, William E. Simpson, District Attorney, Robert Wheeler and J. Miller Leavy, Deputy District Attorneys, for Respondent.

WILSON, J.—The record in this case narrates a series of events as bizarre and fantastic as could be invented by a fictionist but actually a most carefully planned and brutally executed assault. While the evidence is conflicting as to some of the occurrences it is undisputed that the complaining witnesses were viciously assaulted, beaten and thereafter kidnaped by being forcibly conveyed from one place to another in the Hollywood hills. The paramount question in dispute is whether, as asserted by the prosecution, defendants conspired to kidnap the complaining witnesses for the purpose

of assaulting them and did kidnap and assault them, or, as maintained by defendants, the complaining witness Gianaclis arranged to "frame" defendant Massow by having himself kidnaped by defendant Tucker while she was present, thereby implicating her in the crime. By their verdict of guilty the jury adopted the former theory.

Defendants Massow, Tucker, Klinkenberg and Hatfield were charged in seven counts with felonies alleged to have been committed on June 30, 1947: (1) Kidnaping Nicholas Dan Gianaclis while they were armed with a deadly weapon; (2) robbery of Gianaclis; (3) assault with a deadly weapon upon Gianaclis; (4) assault with a deadly weapon upon Verne Davis; (5) kidnaping of Gianaclis for the purpose of extortion and robbery; (6) violation of the Deadly Weapons Act (Stats. 1923, ch. 339, p. 695, as amended; 1 Deering's Gen. Laws (1944 ed.), p. 864, Act 1970); (7) conspiracy to commit the several crimes of murder, kidnaping (Pen. Code, § 207), robbery, assault with a deadly weapon (Pen. Code, § 245) and violation of the Deadly Weapons Act.

The overt acts alleged to have been committed in furtherance of the conspiracy charged in count 7 are as follows: (a) Tucker and Miss Massow instructed one Barbara Whitworth to rent an automobile; (b) Miss Massow obtained an automobile from one Barclay Thomas; (c) she drove an automobile into Laurel Canyon; (d) Klinkenberg, Tucker and Hatfield drove and rode in an automobile into Laurel Canyon; (e) Tucker and Hatfield obtained a blackjack.

The jury found defendants Massow and Tucker guilty as charged in counts 1, 3, 4, 6 and 7 and that they were armed while committing the crime of kidnaping as alleged in count 1. Klinkenberg was found guilty under counts 3, 4 and 6, and Hatfield under count 6. The latter two were sentenced to the county jail and have not appealed. All defendants were found not guilty under count 2, and count 5 was dismissed by the district attorney. Defendants Massow and Tucker presented motions for new trials which were denied. Miss Massow was sentenced to the California Institution for Women and Tucker to the state prison at San Quentin. Miss Massow has appealed from the judgment and from the order denying her motion for a new trial and has purportedly appealed from the verdicts. Tucker has appealed from the judgment and from the order denying a new trial.

Defendants assign as grounds for reversal the insufficiency of the evidence to sustain the verdicts and the judgments and

prejudicial errors occurring at the trial. Their briefs are devoted primarily to a discussion of the evidence, their version of which, insofar as it relates to events in dispute, is based chiefly on their own testimony. But there are volumes of evidence given by other witnesses which point unerringly to their guilt.

SUFFICIENCY OF THE EVIDENCE

In 1943 or 1944 Miss Massow met Gianaclis and thereafter often visited his store to obtain articles needed by her employer. She invited him to her home where he became acquainted with her father and mother. She indicated her interest in obtaining employment as an actress in motion pictures and told Gianaclis she had attended a dramatic school where one Kachel had been her coach. Gianaclis told her he could not aid her in gaining employment as an actress. Later he was instrumental in obtaining a position for her as cashier in a restaurant in one of the large studios. As a result of acquaintances thus made she was hired to act in one or two pictures. Thereafter through his influence she was employed in another studio and through arrangements made by him she adopted as her professional name Madge Meredith. They had slight though not serious disagreements whenever she talked of having an agent.

In the fall of 1943 Miss Massow called on Kachel several times. Gianaclis accompanied her on one of her visits and sought to induce Kachel to coach her in connection with her studio work. Kachel consented and during the remainder of 1943 and a part of 1944 instructed her, refusing to accept any compensation.

About the beginning of 1946 Miss Massow, Gianaclis and Kachel agreed to live under the same roof to serve the latter's convenience in his coaching. They purchased a house which will be referred to as the Magnolia house or property. While Gianaclis was to advance the funds for the purchase each party was eventually to pay one third of the cost and each was to have a one-third interest. They regarded the property as a profitable investment and estimated it could be sold for a large profit.

Kachel was a "dummy" in the purchase, the deed having been made in his name. It was agreed that thereafter Kachel was to convey title to Miss Massow and himself. Because of domestic difficulties it was inadvisable to have Gianaclis appear as a part owner and Miss Massow said she could not have it in her name because of trouble at home. Although

she had always declared it was a "three way deal," a grant deed to her alone was subsequently executed by Kachel. Gianaclis, Miss Massow and her family resided in the house for several weeks. Eventually Kachel was "frozen out" of the transaction and Gianaclis and Miss Massow entered into an agreement whereby each should own a one-half interest. She said she had sufficient money to pay her share. Gianaclis deposited his half of the purchase money. He and Miss Massow went to a notary public whom she instructed to prepare a deed conveying a one-half interest to Gianaclis. Both were specific in their statements to the notary that they were making an investment from which each was to benefit when the property should be sold.

In the fall of 1946, because of a disagreement between Miss Massow and Gianaclis, she and her family moved out of the house. Gianaclis suggested that inasmuch as they were drifting apart the property should be sold and the proceeds divided. For the first time she asserted sole ownership and said the house was not for sale. When Gianaclis interviewed a real estate agent concerning the price that could be obtained for the property she repeated that he had nothing more in the property than a trust deed. He never claimed more than a half interest.

In January, 1947, Miss Massow sued Gianaclis claiming to be the sole owner of the Magnolia property. The case came to trial on June 9, 1947, and after some testimony had been given the case was put off calendar.

Prior to the hearing in court she called on Gianaclis at the Magnolia house and threatened that if he did not convey the property to her she would make complaint to the Revenue Department, the State Board of Equalization, the narcotic squad and the immigration officers. She told him she had reported him to each of those offices and unless he deeded the property to her she was going to "use the prosecution" against him. She advised him during their conversation, which extended from 11 o'clock in the evening until 5 o'clock the following morning, what would happen to him if he did not comply with her demands for a deed to the property. A revenue officer informed Gianaclis that she had reported him to that office. A few days prior to the trial Kachel advised Miss Massow that Gianaclis had said he and Miss Massow jointly owned the Magnolia property. Her reply was that the place was her own and Gianaclis had merely loaned her the purchase price. She later suggested to Kachel that he

might inform Gianaclis that she had reported him to the law enforcement officers.

About November, 1946, Miss Massow met defendant Tucker, a nurseryman and landscape gardener, when he was employed to plant a lawn on the Magnolia property. After her appearance in court in the civil action against Gianaclis on June 9, 1947, she and Tucker became friendly and he took her out socially. He had never done so before. At the time of the hearing in the civil action Tucker knew Gianaclis was claiming a half interest in the property and Miss Massow was trying to obtain the entire title. He encouraged her in her claim of sole ownership. After the hearing Tucker told her Gianaclis had attempted to bribe him, Tucker, as a witness.

Defendant Klinkenberg was a cook in a café on Laurel Canyon Road in the neighborhood of the Magnolia house. Tucker had given Klinkenberg some needed assistance in a fight in April, 1947, and in return Klinkenberg promised to do a favor for Tucker whenever the latter needed it. During May and June Klinkenberg and Tucker met frequently. In the latter part of June Tucker asked Klinkenberg to assist in a farce "frame-up" and Klinkenberg agreed to do so.

On June 25, 1947, Tucker purchased a Colt automatic pistol for $85 and some shells, the gun being the one used in the crime charged against defendants. On the following day Tucker applied for a permit to carry a gun, stating to police officers as some of his reasons that his wife had been threatened by Gianaclis because of his testimony in the superior court and that he was involved in civil litigation with Gianaclis. This statement was false, for Tucker had never had any trouble with Gianaclis and his wife had not been threatened. They had been divorced in April previously. The officers told him if he believed the threats were serious they would procure a prosecution, to which he replied it was a minor matter and he was not interested in prosecuting.

On the afternoon of Friday, June 27, at the suggestion of Miss Massow, Tucker registered her and himself at a motel as "Mr. and Mrs. A. W. Tucker." Thereafter they saw each other frequently at the motel and at Tucker's nursery. On the day following the registration at the motel Miss Massow complained to the officers at the Hollywood police station that Gianaclis had followed her, "had thrown her clothes around" and had slandered her, but she did not indicate he had made any threat to commit a felony.

Barclay Thomas, who was Gianaclis' former son-in-law, was the registered owner of a Chevrolet automobile. Shortly after purchasing it he had brought Miss Massow in it from Texas to Los Angeles. For a long time she had owned and driven a Ford roadster. On June 29, about 7 o'clock in the evening, she met Thomas by appointment and they exchanged cars, Miss Massow driving away in the Chevrolet belonging to Thomas. She had the car in her possession on June 30, the date of the crimes. In the Chevrolet when it was delivered to Miss Massow were a target pistol, seven unfired rounds and a box of additional shells.

After Tucker had received Klinkenberg's agreement to cooperate as above related he sought a third man and asked one Frank Markevikio to join in the enterprise, offering him $50 for his services. The latter was not able to assist but suggested that one Hatfield might be interested. Markevikio said Hatfield had been a policeman and still had his auxiliary badge and permit and would be a good man to assist them. Tucker asked Markevikio to arrange a meeting with Hatfield for Sunday evening.

On Sunday, June 29, at about 8:30 p. m., Miss Massow in the Chevrolet called for Tucker at the latter's nursery. An appointment had been made for them to meet Hatfield, Markevikio having described the car Hatfield would be driving. When Miss Massow and Tucker arrived at the meeting place at about 9:30 p. m. Hatfield was not there. They drove away and came back later and found him waiting. He had received a telephone call and had left his home about 10 o'clock with a "sap" or blackjack in his car. He went to the meeting place and remained until Miss Massow and Tucker arrived in the Chevrolet. This was their first meeting with Hatfield. They drove alongside his car and Tucker said: "Did Frank call you?" Hatfield replied in the affirmative. Tucker asked if Markevikio had explained everything and Hatfield said Markevikio had told him what Tucker wanted him for. Tucker said, "Well, let's go," and then asked whether Hatfield had anything with which to protect himself. Hatfield said he had a gun and handcuffs at home and had a "sap" with him. Tucker said: "Toss the sap in the car and let's go." Hatfield then placed the blackjack in the Chevrolet. At that time Miss Massow was seated in the center of the front seat. Hatfield came to the right-hand side of the car, sat down and pushed the blackjack under the seat, having it in his right hand as

he opened the door with his left. He did not try to conceal it. Tucker, Hatfield and Miss Massow then drove away.

On the evening of June 29, at about midnight, Tucker went alone to the home of his friend Barbara Whitworth and asked her if she would stay with Miss Massow while he took care of some business, to which she assented. She was with defendants Massow, Tucker, Klinkenberg and Hatfield from midnight on June 29 until the morning of June 30 at the motel. The two women occupied one room and the men were in another.

A waitress in the café where Klinkenberg worked had seen Tucker in conversation with Klinkenberg several times during June. On two occasions during the evening before the commission of the crimes she saw Klinkenberg come from the kitchen and join Miss Massow and Tucker in a booth. Tucker was in and out of the café during the evening. The waitress saw Miss Massow at about 11:45 p. m. in a booth with Tucker, Hatfield and Klinkenberg. Just at midnight, which was closing time, the waitress let Tucker into the café with Miss Whitworth. She saw Miss Massow, Miss Whitworth, Tucker, Hatfield and Klinkenberg leave the café together shortly after midnight.

Klinkenberg was driven to his home where he changed his clothes. They drove to Tucker's nursery from which the five persons named proceeded to the motel, arriving there at about 1:30 or 2 a. m. After about 15 minutes the three men proceeded to the vicinity of the Magnolia house where Tucker was absent from the car for a few minutes. The men all returned to the motel arriving at about 5 a. m. on June 30. After knocking on the door they were admitted to the cabin occupied by the two women who dressed and remained awake thereafter. They did not complain about being disturbed at the early hour. Tucker and Klinkenberg went to the café in the motel and remained about an hour, drinking coffee and liquor, then returned to one of the cabins where Tucker showed Klinkenberg how to operate a .45 caliber Colt automatic. Klinkenberg put the gun in his coat pocket. Tucker also handed Klinkenberg a .22 caliber target pistol and showed him how to operate it.

Tucker asked Miss Whitworth to go into Hollywood and rent a car for him, stating he needed a rented car for use in some business. Miss Massow, at Tucker's request, drove her to a motor livery in Hollywood. This was the first occasion on which Miss Whitworth had rented a car for Tucker. Before the women left the motel Tucker had asked Miss Massow

whether she had some money. Upon arriving at the motor livery Miss Massow gave Miss Whitworth $50 for the deposit required for the rental. Upon making the deposit Miss Whitworth received a Nash sedan. When the women separated Miss Massow said she was going to take care of some business, and asked Miss Whitworth to tell Tucker to meet her, Miss Massow, near Laurel Canyon. The message was delivered when Miss Whitworth returned to the motel with the Nash car and Tucker said it was all right. She saw Tucker, Klinkenberg and Hatfield in one of the rooms at the motel. Later Miss Massow appeared.

While Tucker and Klinkenberg were in the café of the motel early in the morning of June 30 the assistant manager saw them and because he noticed a bulge in Tucker's hip pocket and a bulge under Klinkenberg's left arm he began watching them; both appeared to be nervous. Klinkenberg made several telephone calls at the pay station and seemed excited. After each call Tucker and Klinkenberg would converse in a whisper or an undertone. The assistant manager noticed a large scar on the left side of Tucker's face which, from his experience in having worked in motion picture studios, he recognized as make-up.

On the morning of the crime Miss Whitworth saw Miss Massow helping Tucker to apply make-up to his face. Over the initial application a large scar about two inches long was simulated. At Klinkenberg's request Miss Whitworth darkened his mustache and put eyebrow pencil on Hatfield's mustache. Miss Whitworth testified that a blackjack and a piece of wire were taken from the Chevrolet which Miss Massow had been driving. Miss Whitworth saw on the dresser at the motel some adhesive tape and scissors. Tucker had taken the scissors from Miss Whitworth's home on the previous evening. Miss Whitworth heard Tucker say something to Klinkenberg and Hatfield about "the Greek" and "Mugsie," these being names applied respectively to Gianaclis and Davis.

About 9:30 a. m. all four defendants, Massow, Tucker, Klinkenberg and Hatfield, left the motel, the three men in the rented Nash going first, followed by Miss Massow in the Chevrolet. Just before entering the car Tucker gave Klinkenberg the .45 caliber gun, showing him the safety catch. The latter put the weapon into his coat pocket and had it in his possession until their subsequent arrival at Lopez Canyon. The target pistol was on the front seat between Tucker and

Klinkenberg. Tucker had the make-up on when the Nash left the motel.

When Miss Whitworth first saw the blackjack it was under the seat of the Chevrolet. Hatfield asked her to reach under the seat and "get that sap," which she did. The same blackjack was at the motel. Hatfield confirmed Miss Whitworth's testimony and said he took the "sap" into the motel. He next had possession of it after the occurrance at the Hairpin Turn when Tucker returned it to him. Tucker testified the blackjack was at the motel and Hatfield furnished it.

Miss Whitworth saw two guns at the motel; one resembling the target pistol was in Klinkenberg's inside coat pocket and the automatic was on top of a closet when she first saw it. Later she observed a bulge on Tucker where he had his coat over it. Tucker testified the gun was his; he bought shells when he purchased the gun; he put shells in it at the motel on the morning of June 30. On the same morning Klinkenberg saw two loaded guns and a blackjack at the motel.

When the three men left the motel in the Nash car Tucker was driving, Klinkenberg was in the front seat with him, and Hatfield was lying on the back seat. Tucker mentioned that now they were to meet the two men Tucker had previously spoken about to Klinkenberg. The Nash proceeded up Laurel Canyon Drive in the direction of the Magnolia property. Just before they turned into Kirkwood Drive the Chevrolet came toward them from the general direction of the Magnolia house.

Klinkenberg testified that it appeared to be the same car in which he had ridden on the previous night; Tucker waved his hand to a woman in the Chevrolet and there was a responsive wave from her; the men continued in the Nash on Kirkwood Drive and turned into Ridpath Drive where they parked facing Kirkwood; in a short time Gianaclis and Davis came down the hill in a car from the direction of the Magnolia house; Tucker directed Klinkenberg's attention to the car; in less than five minutes the same car returned up the hill with the Chevrolet immediately in front of it; the woman was the only person in the Chevrolet; both cars were going toward the Magnolia house.

Davis, the other person assaulted by defendants, was a common laborer who had known and worked for Gianaclis for several years. The latter was in the habit of leaving the Magnolia house at 9 o'clock in the morning. On June 30 he and Davis left at about that hour in a Ford pickup truck with Gianaclis driving. On their way down Laurel Canyon

they saw Miss Massow alone traveling slowly in the opposite direction in the Chevrolet. She slowed her speed, smiled and waved to Gianaclis with a sweeping motion of her arm in a manner indicating her desire that he should turn and follow her, which he did. She drove to Hairpin Turn with Gianaclis and Davis behind her. When they passed the point where the Nash was parked Tucker said: "There they are; let's go." The men in the Nash proceeded toward Hairpin Turn following Gianaclis and Davis at some distance. There was no rear-vision mirror in Gianaclis' car and he did not observe the Nash following. At Hairpin Turn Miss Massow stopped and blocked the road. Gianaclis and Davis recognized her and when they had stopped both heard her yell: "There they are boys, get them." The three men jumped from the Nash sedan, having two guns and a blackjack. Tucker took the "sap" which Klinkenberg handed to him.

When Tucker and Hatfield left the Nash Tucker spoke to Gianaclis. Davis and Hatfield did not say anything. After Tucker had spoken to Gianaclis the latter and Davis alighted from the car on Tucker's command. When he told them to lie down they dropped to their knees. Davis saw a blackjack and was struck two or three times on the back of his head with it or with a gun. The men beat Gianaclis severely. He was hit on the head 18 or 20 times with a gun in the hands of Tucker, resulting in a scar on his forehead. They beat his back and legs also.

Miss Massow was the only occupant of the Chevrolet at Hairpin Turn. She heard screams and knew someone was being hurt. She did not reply to Hatfield when he inquired whether the men had been molesting her. After he had instructed her how to back her car and turn it she drove down the hill.

Hatfield heard a noise behind him and walked to the front of Gianaclis' car where he saw Gianaclis and Davis on the ground. Tucker was standing by the feet of the two men who were lying down. Hatfield saw Gianaclis had been beaten and was badly injured. Tucker then said "Let's get out of here." The two men on the ground got up and Tucker told them to get into the Nash. Klinkenberg held the door open and Gianaclis and Davis got into the back seat of the Nash or were pushed in. Blankets were placed over their heads. Hatfield said, "I don't want any part of this." Tucker replied: "Shut up and get in the car." At that time Tucker was in the car with a pistol which he waved at Hatfield.

The Nash then left Hairpin Turn with the five men in it and proceeded down a side road. They drove for about an hour and a half. On the trip down the canyon Gianaclis was struck again. He asked the men if they wanted money, saying he would give it to them. One of the men replied they were getting $2,000 from Miss Massow and Thomas to have Gianaclis "bumped off" and they did not want his money.

At Laurel Canyon Hatfield said he was not needed and requested to be allowed to leave the car. Tucker said: "Never mind that, you are riding along." At Lopez Canyon all alighted from the car. Tucker cut adhesive tape and Klinkenberg placed it over the eyes of Gianaclis and Davis. The two men were compelled to crawl on their hands and knees over rocks and rough ground. Tucker put a gun under Gianaclis' chin and said: "I will blow your brains out if you make a move." Gianaclis and Davis were left alone with Klinkenberg. Tucker told the latter to guard the two men and to shoot them if they made a move.

Tucker handed the .22 caliber gun to Klinkenberg and the latter returned the .45 caliber automatic to Tucker. Tucker and Hatfield then left the scene. Tucker told Klinkenberg he was getting $5,000 to do what he was doing. As Tucker and Hatfield rode from Lopez Canyon the latter received $50 from Tucker who said, "You were along on it, I want to pay you for your time." Apparently with the intent to discredit Gianaclis and to justify the acts that Hatfield had witnessed, Tucker made disparaging statements about Gianaclis, saying the latter had committed several crimes, including embezzlement from various people and a criminal attack on a girl.

After about three hours Gianaclis and Davis escaped from Klinkenberg. They met one Howell who reported their plight to deputy sheriffs. The latter, while responding to the call, encountered Klinkenberg by the roadside, not far from where the men had been left in his custody, and took him with them. They found Gianaclis and Davis in an injured, excited and nervous condition. The latter, after relating their account of the assault to the deputies, were taken, together with Klinkenberg, to the sheriff's substation where they identified Klinkenberg as the person who had guarded them.

A doctor examined Gianaclis and said his injuries could have been inflicted at about 10 o'clock in the morning. He was bleeding from a scalp injury, had contusions on the neck and on the back of his right hand. The scalp injury was

about 3 inches long, the skin being broken, exposing the skull. Ten stitches were required to close the wound. Davis' injuries were treated at a receiving hospital.

Edwin Grooney, an employee at Tucker's nursery, testified that about noon on June 30 Tucker and Hatfield drove to the nursery in the Nash sedan. Tucker was still wearing his make-up and at first was not recognized by Grooney because of the unusual scar on his face. At Tucker's direction Grooney bought soap and Tucker washed off the make-up. Tucker then told Grooney to clean up the Nash sedan with a steam cleaning equipment. Blankets on which there were stains that looked like blood were removed from the back seat of the Nash. At Tucker's order Grooney purchased gasoline and poured it over the blankets and some sheets and burned them. Tucker told Grooney not to say anything about what he had seen. Grooney saw stains that resembled blood on the cushion of the back seat. Tucker explained that he had run over a dog and had thrown it on the seat. In his testimony at the trial Tucker himself admitted there was blood on the cushion and said he did not want to return the car to the rental agency in that condition.

Tucker worked on the entire inside of the Nash with the steam cleaner for about half an hour, after which Grooney continued with the cleaning operation. Miss Massow arrived at the nursery in the Chevrolet while the Nash was being cleaned. She looked into the interior while Grooney was working. Hatfield also was present.

Tucker, Hatfield and Miss Massow left the nursery in the Chevrolet about 2 o'clock in the afternoon. Hatfield was taken to the place where he had left his car on the previous night. Tucker returned the "sap" to Hatfield in Miss Massow's presence. Between 3:30 and 4 o'clock Tucker and Miss Massow arrived at Miss Whitworth's house in the Chevrolet and all three went to Lopez Canyon to look for Gianaclis, Davis and Klinkenberg. Not finding them Tucker fired his automatic in the air several times, saying he wanted Klinkenberg to hear him. After driving around for awhile they met Mr. Howell who had called the deputy sheriffs and asked if he had seen the men but he did not give them any information.

They returned to the nursery where Miss Whitworth observed that the seats of the Nash were wet. They had not been in that condition when she rented the car. On the next day she returned it to the motor livery.

Miss Whitworth testified that shortly after 10 a. m. on June 30 Miss Massow returned to the motel without the men; she was crying, and said "It was terrible the way they screamed," and that one of the men told her to leave.

On July 1, the morning after the assault, Tucker and Miss Massow went to another motel in the Chevrolet, Tucker driving, where at her request he registered as "Mr. and Mrs. A. W. Tucker, 7246 Lankershim," this being the address of Tucker's nursery. Miss Massow paid the rent at the motel office on the following morning. On July 3, some of Tucker's clothing was found by officers at the same motel.

Tucker and Miss Massow knew they were being sought by the police. Prior to her surrender and his arrest they were together eight or ten hours talking over the predicament in which they were involved. They discussed parking the Chevrolet at a distant point. She told Tucker everybody was on the lookout for the red Chevrolet and she had been advised by her attorney not to be apprehended on the way to his office. She took the Chevrolet to Orion Street, near Sepulveda Boulevard, Tucker following in a pickup truck. She parked and locked the car and put the keys on the left rear tire under the fender. On July 3d deputy sheriffs found the car at the place mentioned with the keys hidden as described.

Miss Massow surrendered to officers in the afternoon of July 2d. At that time she did not give them the name of any of the men involved in the assault. She testified that she knew where Klinkenberg had been employed as a cook, she knew Hatfield had been a police officer in Beverly Hills, and she knew where Tucker's nursery was located; she did not give such information to the police because Tucker had asked her not to do so. She told the officers she had never before seen the occupants of the Nash car and that only one had got out of the car at Hairpin Turn. She testified Tucker told her "The reason we had Hatfield along was because when we disclose this whole matter to the police we will have a former policeman to tell all about these things."

Tucker read the newspaper accounts of the kidnaping and knew the police were looking for the persons who had committed the crimes but did not impart his knowledge to them, did not inform them Gianaclis had arranged a fictitious holdup, nor did he seek any law enforcement officers to return to Lopez Canyon and look for Gianaclis, Davis and Klinkenberg after he ascertained they had departed from there. He drove Miss Massow to the place arranged for her surrender

and about seven hours thereafter he was placed under arrest.

The foregoing facts negate defendants' fanciful argument that the evidence is insufficient to sustain the verdicts and the judgments. They would have us disbelieve all the evidence above related and adopt their version of the events leading up to the assault. Miss Massow professes to have been without knowledge of the contemplated crime and asserts that it was merely by chance that she was on her way to the Magnolia property when Gianaclis followed her and was in turn followed by Tucker, Hatfield and Klinkenberg in the Nash. No explanation is offered as to why, just prior to the commission of the crimes, she turned her Ford car over to Thomas and received from him the Chevrolet which was used in the manner related. No doubt it was deemed inadvisable to permit her Ford car to be seen at the motel or at the agreed point of ambush. She offers no explanation as to why she participated in putting the make-up on Tucker's face. She did not deny knowledge of the presence of the two guns and the ''sap'' at the motel and in the automobiles. When she and Tucker met Hatfield on the night before the crime she heard Tucker tell Hatfield to toss the ''sap'' into the car. Other matters pointing unmistakably to her participation in the conspiracy are likewise without explanation.

The jury found Tucker's story to be equally incredible. He asserts Gianaclis planned to have Miss Massow present while he would be ''held up'' by Tucker and two other men with guns and blackjacks and taken to some place in the mountains, and that Gianaclis offered him $5,000 to help ''frame'' Miss Massow. The jury disregarded the preposterous theory advanced by Tucker that Gianaclis arranged and agreed to pay for a villainous assault upon himself that might have resulted in his death or serious injury merely for the purpose of ''framing'' Miss Massow. The jury found that the so-called ''farce'' or ''frame-up'' was in truth a tragedy with Tucker as its director and chief actor and Miss Massow as assistant director, make-up artist and leading woman.

In arguing that if the evidence is viewed ''in the light of human experience'' it must be held to be implausible and improbable defendants overlook the fact that a great deal of the most damaging evidence against them came from one or more of the persons who were engaged in the nefandous venture, and some of it from the appealing defendants themselves.

Much ado is made concerning discrepancies in the evidence fixing the exact hour and minute at which some of the events occurred, for example, the time when make-up was applied to Tucker's face. It is freely admitted by all parties that make-up, including the simulated scar, was applied before defendants started from the motel to Laurel Canyon and Hairpin Turn. Contradictions and conflicts in the evidence as to other incidents are discussed in defendants' briefs, vainly, however, since the jury has reached its determination as to the facts, presumably after they had heard the same arguments that have been made to this court.

■ Defendants contend that the evidence is insufficient to prove their guilt beyond a reasonable doubt, and that the following language quoted from *People* v. *Zammora,* 66 Cal. App.2d 166, 201 [152 P.2d 180], requires a reversal of the judgments: "The sufficiency of the jury's verdict must be tested in the light of whether the evidence upon which the verdict is framed was of such a character that it can be said therefrom that no reasonable doubt of the defendant's guilt existed." Defendants have misconceived the meaning intended by the quoted passage. The court had concluded that "there is a complete lack of material and relevant evidence from which the jury could properly find or infer that appellants formed a conspiracy of the kind . . . claimed by the prosecution. The most shown by the evidence is that appellants banded themselves together to have it out . . . with their fists . . . in retaliation for the fistic encounter that had taken place earlier that night." There was no proof that any of the defendants murdered the victim and only unsatisfactory evidence that any defendant committed an assault with a deadly weapon. In short the reviewing court discovered no substantial proof of the crimes charged.

No such situation confronts us in the instant case. The events heretofore recited leave no doubt that the jury had an abundance of competent evidence to warrant their verdict. When they rejected the evidence of the defense and adopted that of the prosecution the latter supported the finding of guilt.

The above quotation from the Zammora case cannot be construed to mean that the rule of reasonable doubt which is binding on the jury in weighing the evidence likewise circumscribes an appellate court in its consideration of the record upon which the verdict rests. Defendants' suggestion that such is the rule to be followed by a reviewing court

runs counter to the law as it has been firmly established in this state. It is not within the province of this court to determine conflicts of evidence or inferences reasonably to be drawn from the evidence. The sole question with which we are concerned is whether there is substantial evidence to support the judgment. Before an appellate court may set aside a judgment of conviction it must appear that upon no hypothesis whatsoever is there sufficient substantial evidence to support it. (*People* v. *Warnick,* 86 Cal.App.2d 900 [195 P.2d 552]; *People* v. *Lindley,* 26 Cal.2d 780, 791 [161 P.2d 227]; *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778]; *People* v. *Hills,* 30 Cal.2d 694, 701 [185 P.2d 11]; *People* v. *Smith,* 35 Cal.App.2d 73, 76 [94 P.2d 633].) The determination of a criminal case involves proof (1) that the offense charged was committed (2) by the person or persons accused thereof. Every fact which the jury could have reasonably deduced from the evidence will be assumed in favor of the verdict, and the appellate court will then determine whether such facts are sufficient to support it. If the verdict is justified by the circumstances a reviewing court will not interfere with the jury's determination even though the court might be of the opinion that such circumstances might also be reasonably reconciled with the innocence of the defendant. (*People* v. *Newland, supra.*)

The foregoing citations are only a few of many which declare that the reviewing court is not concerned with the question of reasonable doubt but only with whether there is sufficient substantial evidence to support the verdict. While there is conflicting evidence in the instant case, the jury has resolved the conflicts against the defendants and has not accepted the theory advanced by them. ▮ The jury may disregard the testimony of a defendant even though uncontradicted and need not accept it as proof of facts leading to the commission of a crime when other circumstances warrant the disbelief of such testimony. (*People* v. *Toliver, ante,* p. 58 [202 P.2d 301]; *People* v. *Benning,* 84 Cal. App. 168, 172 [257 P. 903]; *People* v. *McDonnell,* 32 Cal. App. 694, 699 [163 P. 1046]; *People* v. *Borrego,* 211 Cal. 759, 765 [297 P. 17].)

It is manifest from the record that the evidence is more than adequate to sustain the verdicts.

▮ Defendants advance the absurd and untenable contention that the judgment should be reversed because the evidence of the prosecution is inherently improbable. A re-

viewing court cannot reject statements of a witness that have been believed by the trier of facts unless it is a physical impossibility that they be true or their falsity be apparent without resorting to inferences or deductions. (*People* v. *Huston,* 21 Cal.2d 690, 693 [134 P.2d 758].) Evidence which discloses circumstances that are unusual cannot be said to be inherently improbable. (*Kidroski* v. *Anderson,* 39 Cal. App.2d 602, 605 [103 P.2d 1000].) In order to say that a statement is inherently improbable it must appear that what has been related or described could not have occurred. .

### ALLEGED MISCONDUCT OF DISTRICT ATTORNEY

■ Defendants contend that the verdict was based on passion and prejudice induced by inflaming and prejudicial statements made and questions asked by the deputy district attorney. We are not directed to a single instance of alleged misconduct which defendants objected to, moved to strike, assigned as error, or requested the court to instruct the jury to disregard. The general rule is that having failed so to do, the objection cannot be raised for the first time on appeal. (*People* v. *O'Donnell,* 11 Cal.2d 666, 671 [81 P.2d 939]; *People* v. *Wong Toy,* 189 Cal. 587, 595 [209 P. 543].)

Defendants recognize the foregoing rule but maintain that the misconduct occurred so many times that they were prevented from having a fair trial, and so inflamed the jury that they were induced to find defendants guilty even though an impartial consideration of the evidence alone would have resulted in their acquittal. They contend that the case is within the exception stated in *People* v. *Podwys,* 6 Cal.App.2d 71, 76 [44 P.2d 377], and *People* v. *Simon,* 80 Cal.App. 675, 679 [252 P. 758]), that where the "record fairly shows that the acts complained of are of such a character as to have produced an effect which, as a reasonable probability, could not have been obviated by any instructions to the jury, then the absence of such assignment and request will not preclude the defendant from raising the point in this court." This contention requires us to consider the several instances of alleged misconduct and to determine whether the prosecutor's acts were wanton and without foundation or were justified by the record.

(a) Defendants assert that by inferences and innuendo the prosecutor attempted to implant in the minds of the jury untrue ideas that in a spirit of altruism Gianaclis was responsible for Miss Massow's advancement and "when she

was on the road to success she got rid of him.'' We have referred to evidence of the assistance given by Gianaclis to Miss Massow in fulfilling her desire to appear in motion pictures. One witness testified, without objection from defendants, that Miss Massow had said to the witness that Gianaclis had started her on her career and had more or less built her up to where she was at that time, and ''that so far he was just an angel to her and that when she got this part in 'The Robe' she would be on her own and get rid of him. She laughed about it.''

(b) Error is asserted in the intimation by the prosecutor that when the Magnolia property increased in value Miss Massow tried to keep it all for herself by asserting Gianaclis loaned her money, rather than having invested on equal terms with her. The question as to the ownership of the house was threaded through the entire trial. It is in evidence that it was first agreed Gianaclis, Kachel and Miss Massow were to have equal interests in the property; later Kachel was eliminated, Gianaclis deposited the money for the purchase of the property, and Miss Massow actually claimed he had no interest in it except a trust deed. The civil action to which we have referred was brought by her for the purpose of establishing her claim of ownership.

(3) The next assignment is that reference was made to Miss Massow as a ''home breaker'' and that she broke up the marriages of both Gianaclis and Tucker. The evidence as to the divorce of Gianaclis and his wife was brought out by Miss Massow's trial attorney in his cross-examination of Gianaclis, who testified that she ''brought my wife to sue for divorce,'' and ''she brought her down here to break my home up.'' He further testified that he and his wife had become reconciled and were living together at the time of the trial. The prosecutor's questions upon the subject were on redirect examination immediately following the closing of the cross-examination upon the matter of the divorce. Furthermore, it was stipulated by counsel for all parties that a divorce action was filed but did not result in a decree. On cross-examination of Miss Massow she testified she had never ''planned on marrying Gianaclis.''

As to Tucker, it was brought out, without objection, that he was divorced in April, 1947, some months after he had met Miss Massow and about three months before the date of the commission of the crimes; that he frequently took her out socially. It was admitted that prior to the crimes Tucker and

Miss Massow had driven in Thomas' Chevrolet to the first motel at which they registered and that at her suggestion he registered as "Mr. and Mrs. A. W. Tucker." On the evening of the date of the crime they registered at the other motel under the same names.

Such references to Miss Massow's conduct with Gianaclis and Tucker were justified by the evidence, a part of which was elicited by questions of counsel for defendants, and the fact that Tucker denied he had had any immoral relations with her did not preclude the prosecutor from commenting on the uncontradicted evidence concerning their association.

(d) Objection is also made to inferences that Miss Massow had immoral relations with Tucker and Barclay Thomas, Gianaclis' former son-in-law. Her relations with Tucker have been sufficiently discussed. It was established that Thomas and Miss Massow met somewhere in another state and he brought her to Los Angeles in his Chevrolet. It was further established, as previously related, that Thomas loaned his car and a gun to Miss Massow which were used in the commission of the crimes.

(e) Defendants complain also of the prosecutor's intimation that she was not a respectful daughter, had had trouble with her parents, and preferred a motel to a rooming house for girls. During her cross-examination concerning her alleged difficulties with Gianaclis she testified she stayed in a motel because she was afraid of him. She was asked the single question "Did you try any rooming houses for girls" and she answered in the negative. There was evidence that she discussed with Kachel and Gianaclis the changing of her name because of her mother. There was no error in the prosecutor's conduct in making reference to such matters. Miss Massow's parents objected to her association with Gianaclis and for this reason the Magnolia house was bought without the knowledge of her parents. After they discovered the purchase had been made and that Miss Massow and Gianaclis were living in the house they visited her and later, at the suggestion of Gianaclis, moved in and resided there.

(f) With respect to the prosecutor's conduct in mentioning Miss Massow's effort to avoid paying a real estate commission, the testimony of the secretary in the real estate office was sufficient to justify such reference.

(g) The next objection made is that the prosecutor improperly implied that Miss Massow was addicted to the use of

vulgar language. This finds justification in the evidence of the secretary in the real estate office that in her conversation with the real estate broker Miss Massow applied a vile epithet to him. The witness had not been asked specifically with reference to any improper language but had been requested to relate conversations of Miss Massow with the witness and the real estate broker in reference to her claim of ownership of the Magnolia property. In response to the question she told the entire conversation including the offensive epithet.

(h) During the prosecutor's argument to the jury he referred to corrections that had been made in the reporter's transcript. We find nothing improper or objectionable in his statements. It is admitted that the transcript had been corrected through the cooperation of counsel and the court, and in one instance the correction was made in open court. By reason of what had occurred in the presence of the jury there was a factual foundation for the argument. In any event, there was nothing prejudicial in the prosecutor's statements and no objection was made or exception taken during the trial.

(i) During the cross-examination of Miss Massow she was asked whether she would waive the privilege of attorney and client in order that her former attorney might be asked to disclose certain information. This form of examination has been declared to be unfair but not prejudicial misconduct. (*People* v. *Moore*, 111 Cal.App. 632, 633-4 [295 P. 1039].)

(j) Defendants' assignment of error that in the guise of attempted impeachment on an immaterial matter the deputy district attorney introduced testimony with respect to an asserted quarrel between Miss Massow and her mother is without foundation. It was brought out in the evidence, without objection, that on occasions the relations between Miss Massow and her parents were not harmonious; that her mother's objection to her association with Gianaclis brought about the purchase of the Magnolia house unknown to her parents. Evidence with relation to these matters was offered for purposes entirely foreign to the matter of the impeachment of Miss Massow.

Since (1) each question asked by the prosecutor and each statement made by him was asked and made without objection or exception by either defendant, (2) some of the questions had a direct relation to previous questions asked by counsel for defendants, and (3) all had foundation in the record, they need not receive further attention.

ALLEGED ERRORS IN GIVING AND REFUSING INSTRUCTIONS

■ Defendants do not contend that the instructions given by the court on the subject of circumstantial evidence are incorrect in any particular but they assign error in the failure of the court to give additional instructions which they requested on that subject. Defendants' requested instructions are based on the erroneous theory that the case against them rested entirely on circumstantial evidence. One of the proposed instructions was to the effect that where circumstantial evidence "is relied upon" each circumstance necessary to complete the chain must be established to a moral certainty and beyond a reasonable doubt. Another would have told the jury that when the case "rests entirely or chiefly on circumstantial evidence" each fact essential to complete the chain of circumstances must be proved beyond a reasonable doubt. Another was to the effect that the jury was not permitted "on circumstantial evidence alone" to find a defendant guilty unless the proved circumstances are not only consistent with guilt but are irreconcilable with any other rational conclusion.

The requested instructions contained erroneous statements and were justifiably refused. Circumstantial evidence was "relied upon" only as incidental to and corroborative of direct evidence and not as the sole proof of defendants' guilt. The case against them did not rest "entirely or chiefly" on circumstantial evidence. The greater part of the evidence connecting them with and establishing their guilt of each crime of which they were convicted is direct, as will appear from a review of the evidence recited in this opinion.

As to defendant Massow there is direct evidence that (1) she obtained the Chevrolet and used it instead of her own car in preparation for and in the commission of the crimes; (2) with Tucker she met Hatfield and obtained the "sap" from him; (3) she assisted in disguising Tucker; (4) she aided in renting the Nash which was used in the preparation of the crimes; (5) she decoyed Gianaclis and Davis to the place of ambush; (6) she called to the other defendants "There they are boys, get them," referring to Gianaclis and Davis; (7) she went with Tucker and Miss Whitworth in search of Gianaclis, Davis and Klinkenberg; (8) she was at Tucker's nursery while the blood was being removed from the Nash.

As to Tucker, some of the direct evidence is that (1) he procured the assistance of Klinkenberg and Hatfield; (2) with defendant Massow he obtained the "sap" from Hatfield;

(3) he sent Miss Whitworth to rent the Nash; (4) he provided two guns and showed Klinkenberg how to operate them; (5) he disguised himelf with Miss Massow's aid; (6) he drove the Nash to the scene of ambush, taking with him his codefendants Klinkenberg and Hatfield; (7) he assaulted and beat Gianaclis and Davis; (8) he kidnaped them; (9) he prepared tape to cover their eyes; (10) he instructed Klinkenberg to guard them; (11) he paid Hatfield for his services; (12) he ordered the bloodstained blankets burned; (13) he cleaned the blood from the Nash.

Where, as in the case at bar, there is direct evidence connecting the defendants with the commission of the crimes charged and the circumstantial evidence is only incidental or corroborative, the court is not required to instruct the jury on the rules of law applicable to circumstantial evidence. (*People* v. *Jerman,* 29 Cal.2d 189, 197 [173 P.2d 805]; *People* v. *Lapara,* 181 Cal. 66, 70 [183 P. 545] and cases cited.)

█ It is not the law, as proposed in one of defendants' rejected instructions, that each fact in a chain of circumstances that will establish a defendant's guilt must be proved beyond a reasonable doubt. (*People* v. *Nunn,* 65 Cal.App.2d 188, 195 [150 P.2d 476]; *People* v. *Parker,* 119 Cal.App. 246, 251-2 [6 P.2d 82].) The doctrine of reasonable doubt applies to proof of *guilt* and not to the establishment of each incident or event inculpating the defendant. (*People* v. *McGill,* 10 Cal.App.2d 155, 160 [51 P.2d 433].) A reasonable doubt that would warrant acquittal is one that results or arises from "a consideration of all the evidence" in the case. (Pen. Code, §§ 1096, 1096a; *People* v. *Nunn, supra; People* v. *Shimonaka,* 16 Cal.App. 117, 125 [116 P. 327].)

█ The court instructed the jury sufficiently on the question of reasonable doubt: (1) Defendants were presumed to be innocent until their guilt was proved beyond a reasonable doubt; (2) in case of a reasonable doubt of their guilt the defendants were to be acquitted; (3) any fact may be proved by direct or circumstantial evidence, both of which were defined; (4) if the evidence is susceptible of two constructions or interpretations, each of which appears to be reasonable, one pointing to guilt and the other to innocence, the jury must adopt the one pointing to their innocence and reject the other; (5) such rule applies only when both of the two possible opposing constructions appear to the jury to be reasonable; (6) should one of two possible conclusions be reasonable and the other unreasonable the jury must adopt the reason-

able; (7) even if a reasonable deduction points to guilt, the entire proof must carry the convincing force required by law to support a verdict of guilt.

■ Defendants assign error in the giving of the following instruction: "Even though you might believe that the witness, Nicholas Dan Gianaclis may have intentionally or mistakenly made a different claim than that to which he was entitled, as to an interest in the house or property at 8444 Magnolia Street, such conduct would not justify any person in kidnaping or assaulting him in any manner, nor for any purpose. Any provocation that might have been created by reason of the claim of the witness Nicholas Dan Gianaclis as to his interest in the property located at 8444 Magnolia Street, either verbally or in civil litigation, would not constitute a defense by these defendants . . ., and would not justify the defendants, or either of them, in kidnaping, assaulting, robbing, or in violating the Deadly Weapons Act, or in conspiring so to do." There is no error in the instruction. Defendants concede that Tucker assaulted Gianaclis and Davis and he, with other defendants, removed them to another part of the county, but their theory is that no crimes were committed because of Gianaclis' connivance in and consent to all the acts which defendants committed. It is conceded that (1) Gianaclis claimed an interest in the Magnolia property, (2) Miss Massow denied his claim and asserted ownership of the entire title, (3) defendants had possession of two guns and a blackjack, (4) they did not have permits therefor, hence such possession was unlawful. The instruction does not indicate that in the court's opinion any of the matters referred to in the instruction were true or that defendants did any of the acts mentioned. (*People* v. *Weatherford,* 78 Cal.App.2d 669, 692-3 [178 P.2d 816].) The instruction does not assume that Gianaclis was assaulted or kidnaped. The language is carefully qualified. The court told the jury that "Even though [they] might believe" Gianaclis either "intentionally or mistakenly" claimed an interest in the house that fact "*would* not" (not "*did* not") justify "any person" in committing the crimes charged and "*would* not" constitute a defense. The law is correctly stated that a claim to ownership of property, even though without foundation, does not justify the commission of a crime, nor does it constitute a defense to a prosecution. Defendants were not entitled to have the jury instructed solely along the line of their theory of the case. It is the duty of the court to instruct the jury not as to theories of

634

either prosecution or defense but as to all matters of law necessary for their deliberations. (*People* v. *Darrow,* 212 Cal. 167, 184-5 [298 P. 1]; *People* v. *Wright,* 167 Cal. 1, 5 [138 P. 349].). Since the matters covered by the instruction had been developed by the evidence it was the duty of the court to inform the jury as to the law in reference to them. (*People* v. *Holt,* 25 Cal.2d 59, 64-5 [153 P.2d 21]; *People* v. *Putnam,* 20 Cal.2d 885, 890 [129 P.2d 367].)

No one contends that Davis consented to the crimes or that he was a party to the arrangement asserted to have been made by Gianaclis. He was the victim of an unprovoked and indefensible assault. The instructions complained of did not operate to dispossess Tucker of his defense that Gianaclis instigated the crimes for the purpose of discrediting Miss Massow. Tucker's evidence on that matter was before the jury and it had been instructed correctly as to its duty in considering all the evidence in the case. It was further instructed that (1) it was to be governed solely by the evidence; (2) it was to weigh the evidence conscientiously and dispassionately; (3) it was the sole and exclusive judge of the effect and value of the evidence; (4) the court does not determine the weight to be given the evidence nor the credibility of the witnesses; (5) no emphasis was intended or to be inferred as to a statement in varying ways of a rule, direction or idea.

Defendant Massow requested (Tucker did not join in the request) the following instruction and contends that it was error to refuse it: ''Before you can find the defendants, or either of them, guilty of the possession of a blackjack, as charged in Count VI of the Information, you must believe from the evidence to a moral certainty and beyond reasonable doubt that they knowingly had such possession, and if after a full and fair consideration of all of the evidence, you entertain a reasonable doubt as to whether or not any particular defendant had any knowledge of the possession of such weapon, then it will be your duty to return a verdict of not guilty as to that particular defendant.'' Since (1) the court gave an instruction as to what constitutes possession of a blackjack and defendant Massow does not contend that such instruction is incorrect in any particular, (2) the jury was given the statutory instruction on the doctrine of reasonable doubt (Pen. Code, § 1096), (3) the foregoing instruction was an iteration of the doctrine of reasonable doubt applied especially to the possession of the blackjack, (4) only one instruction as to reasonable doubt is required by law (Pen. Code,

§ 1096a; *People* v. *Hill,* 76 Cal.App.2d 330, 339 [173 P.2d 26]), no further instruction on the topic was necessary. Moreover, the subject of the rejected instruction is fully covered by an instruction given at defendants' request reading as follows: ''The mere fact that a person is present at the time a criminal offense is committed, or that he in some way aided, such as furnishing the means used in the commission of a crime, is not sufficient of itself to make him guilty of such offense. Before a person, who himself did not commit the act constituting a crime can be convicted thereof, it must also be shown beyond a reasonable doubt that he knowingly and with criminal intent aided and abetted, or advised and encouraged the commission of such crime, or was a member of a criminal conspiracy, and that such crime was committed in pursuance of the object of the conspiracy.''

Defendant Massow requested an instruction to the effect that evidence that a defendant was in the company of one or more persons who were members of a criminal conspiracy is not in itself sufficient to prove that such defendant was a member of the conspiracy. The instruction was properly refused. It would have been superfluous since (1) the court instructed the jury in almost the same language as that requested by the defendant, and (2) all four defendants were present at the time of the commission of the offenses charged and were active participants in the antecedent preparations therefor.

### Verdict on Conspiracy Count

Defendants contend that since (1) they were charged in count 2 with robbery and in count 7 with conspiracy to commit several crimes including robbery, and (2) the jury acquitted them of the latter crime, the verdict is inconsistent. Their contention is that if robbery was not actually accomplished a finding of conspiracy to commit robbery cannot be sustained. This contention is untenable. (*People* v. *Clement,* 97 Cal.App. 238, 241 [275 P. 511]; *People* v. *Rodriguez,* 37 Cal.App.2d 290, 293 [99 P.2d 363]; 12 C.J. 551; 15 C.J.S. 1070.) Conspiracy is a distinct offense from the crime which is planned to be committed. (*People* v. *Gordon,* 71 Cal.App.2d 606, 628 [163 P.2d 110].) Proof that two or more individuals conspired to commit a crime and engaged in overt acts leading to its commission will sustain a conviction of conspiracy even though they failed to accomplish the object of their intrigue. (*People* v. *George,* 74 Cal.App. 440, 454, et seq. [241 P. 97].) In the instant case there is evidence that each of the five overt

acts alleged in the information was committed and that defendants Massow and Tucker each had an active part in some or all of them. The record is replete with evidence that in the furtherance of the conspiracy both engaged in many activities in addition to those set forth in the information. Even though some of the overt acts were not in themselves criminal, yet, if they were performed in preparation for the commission of the criminal act, they are sufficient overt acts to sustain the charge of conspiracy. (*People* v. *Gilbert*, 26 Cal.App.2d 1, 23 [78 P.2d 770].) Furthermore, robbery is not alleged as one of the overt acts. The only substantive offense charged as an overt act is the last, which accuses Tucker and Hatfield of having obtained a blackjack. Defendants were charged with three other substantive offenses, to wit, kidnaping, assault with a deadly weapon, and violation of the Deadly Weapons Act, and in addition with conspiracy to commit those crimes. Since they were found guilty of the three named offenses the fact that they were acquitted of the charge of robbery does not warrant interference with the verdict on the conspiracy charge. (*People* v. *Guerrero*, 22 Cal.2d 183, 187-8 [137 P.2d 21]; *People* v. *Gilbert*, 26 Cal.App.2d 1, 22 [78 P.2d 770].) In *People* v. *Dukes*, 2 Cal.App.2d 698, 700 [38 P.2d 805], wherein the defendants were charged with conspiracy to commit robbery, nine overt acts other than robbery were charged. It was held that although an acquittal of the crime of robbery in a previous trial would have precluded conviction of conspiracy if robbery had been charged as the sole overt act, yet since other overt acts were alleged the acquittal on the former charge was not a bar to prosecution for conspiracy.

Defendants' further contention that the verdict is deficient in that it failed to specify the degree of robbery involved is likewise untenable. The crime of conspiracy is not divided into degrees and the jury is not required to find the degree of that crime. (*People* v. *Clement*, 97 Cal.App. 238, 241 [275 P. 511].) In a trial for conspiracy the fact that robbery may be of the first or second degree (Pen. Code, § 211a) does not require either allegation, proof or verdict as to the degree of robbery which defendants are alleged to have conspired to commit.

Sections 183 and 184 of the Penal Code do not limit the charge of conspiracy to an agreement to commit only one crime. (*People* v. *Welch*, 89 Cal.App. 18, 21 [264 P. 324].)

The crime of conspiracy consists in an unlawful agree-

ment or combination to commit a crime and is separate and distinct from the substantive crime which constituted the object of the defendants' conspiracy. (*People* v. *Yant,* 26 Cal. App.2d 725, 731 [80 P.2d 506].)

An examination of the record consisting of approximately 2100 ·pages, reveals it to be remarkably free of error. Such as occurred are minor and inconsequential; none is prejudicial. There has not been a miscarriage of justice. (See Const., art. VI, § 4½.)

· The judgments and the orders denying motions for new trials are affirmed. The purported appeal from the verdicts is dismissed.

Moore, P. J., and McComb, J., concurred.

Appellant Massow's petition for a hearing by the Supreme Court was denied April 14, 1949, and the following opinion was then rendered:

SCHAUER, CARTER, JJ.—In joining our associates in denying appellant's petition for a hearing in the Supreme Court we deem it proper to point out that on the record before us such denial signifies only that we find no miscarriage of justice apparent on the face of the opinion; in particular, such denial does not constitute an approval of the discussion definitive of circumstantial evidence and relative to the failure of the trial court to give the instructions on that subject as requested. (See *People* v. *Bender* (1945), 27 Cal.2d 164, 175-176 [163 P.2d 8] ; *People* v. *Hatchett* (1944), 63 Cal.App.2d 144, 155 [146 P.2d 469] ; *People* v. *Rayol* (1944), 65 Cal.App. 2d 462, 464 [150 P.2d 812].)